826 P.2d 1186

**STATE of Arizona, ex rel. ARIZONA DEPARTMENT OF REVENUE, Plaintiff–Appellee,**

v.

**Harry DILLON, Sr., an individual, dba Dillon Tobacco Barn, Defendant–Appellant.**

**No. 1 CA–TX 90–033.**

Court of Appeals of Arizona, Division 1, Department T.

Sept. 24, 1991.

Review Denied April 7, 1992.

Grant Woods, Atty. Gen. by Patrick Irvine, Asst. Atty. Gen., Phoenix, for plaintiff-appellee.

Margrave, Celmins & Verburg, P.C. by Gary Verburg, Scottsdale, for defendant-appellant.

## OPINION

JACOBSON, Presiding Judge.

This appeal deals once again with the conflict arising from the existence of Indian reservations within the state of Arizona and the power of the state to tax activities occurring on those reservations.

Harry Dillon, Sr. (Dillon), a member of the Puyallup Indian Tribe of Washington State, appeals from a judgment in excess of $2.5 million for unpaid Arizona luxury privilege taxes assessed over a four-year period on Dillon's sales of cigarettes on the Tohono O'Odham Indian Reservation near Tucson, Arizona, to non-Indians and other nonmembers of the Tohono O'Odham Tribe. The appeal poses the following issues for our resolution:

(1) Whether the Department of Revenue timely filed its complaint as required by A.R.S. § 42–124;

(2) Whether Dillon's status as a member of the Puyallup Indian Tribe of Washington State rendered him immune from Arizona luxury privilege taxation; and

(3) Whether the application of the Arizona luxury privilege tax to the proceeds of Dillon's sales of cigarettes to non-Indians and other nonmembers of the Tohono O'Odham Tribe was federally preempted because Dillon operated on the reservation as a federally licensed Indian trader.

### FACTS AND PROCEDURAL BACKGROUND

The facts that we view as material to our resolution of this appeal are undisputed. Harry Dillon, Sr., is an enrolled member of the Puyallup Tribe of Indians of the state of Washington. Since 1976, as a licensed Indian trader, he has engaged in the business of selling cigarettes as the sole proprietor of the Dillon Tobacco Barn, which is located at the intersection of U.S. Highway 89 and Los Reales Road at the northern boundary of the Tohono O'Odham (formerly Papago) Indian Reservation. U.S. Highway 89 is part of the state highway system and is maintained by the state of Arizona. The portion of Los Reales Road that runs by the Dillon Tobacco Barn, from U.S. Highway 89 west to 12th Avenue, is maintained by the city of Tucson.

The Dillon Tobacco Barn is situated within the exterior boundaries of the reservation, and the business site lease is approved by the Tohono O'Odham Tribe. The tribe imposes a tax on all of Dillon's business at the rate of 5% of the gross sales. For the years 1981 through 1985, this produced approximately $900,000 in revenues to the tribe. Approximately 11.4% of his cigarette sales are made to members of the Tohono O'Odham Tribe. The remaining 88.6% of sales are made to non-Indians and other nonmembers of the tribe.

Dillon does not reside in the state of Arizona. He stays at hotels and motels located off the reservation while he is working at the Dillon Tobacco Barn. Dillon purchases his cigarette inventory from Border Tobacco in El Paso, Texas, which ships cigarettes directly to the Dillon Tobacco Barn. Dillon pays no Arizona luxury privilege taxes when he purchases his inventory, and as a result his cigarette prices are substantially lower than those charged by off-reservation merchants. It is clear that Dillon's business success and the tribe's tax revenues are based upon the competitive advantage Dillon enjoys by selling tax-free cigarettes to non-tribal members.

The Arizona Department of Revenue (Department) audited Dillon's cigarette business for the periods of October 1981 through August 1983 and September 1983 through December 1985. As a result of these audits, the Department issued assessments for luxury privilege taxes pursuant to A.R.S. §§ 42–1201 *et seq.* on all Dillon's cigarette sales during the audit periods. Dillon challenged these assessments unsuccessfully before Department hearing officers and the Department director. *See* A.R.S. § 42–122. He then appealed the Department's final decisions to Division Two of the State Board of Tax Appeals. *See* A.R.S. §§ 42–124 and 42–171. The parties stipulated before the Board that the assessment totals should each be reduced by 11.4%, recognizing the non-taxability of

sales to members of the Tohono O'Odham Tribe. After this reduction, the assessments totaled approximately $2.46 million.

In a 2 to 1 decision, the Board of Tax Appeals reversed the Department's orders, determining that, pursuant to *Warren Trading Post Company v. Arizona State Tax Commission,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965), application of Arizona's luxury privilege tax to a federally licensed Indian trader was federally preempted.

On January 27, 1989, the 52nd day following Dillon's counsel's receipt of the Board's decision, the Department brought this action in the Arizona Tax Court to review the decision of the Board of Tax Appeals. Dillon moved to dismiss the action as untimely. The tax court denied the motion to dismiss, interpreting A.R.S. § 42–124 "to permit the appeal to be filed at any time up to 60 days after the decision of the State Board of Tax Appeals."

The Department and Dillon then filed cross-motions for summary judgment on the merits. After briefing and argument, the tax court granted summary judgment in favor of the Department. Based on *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), the tax court determined that neither Dillon's status as a member of the Puyallup Indian Tribe nor his status as a federally licensed Indian trader required the conclusion that federal law preempted application of the state tax. The court also found that the indirect economic impact of the tax on the Tohono O'Odham Tribe did not invalidate the tax as applied. The tax court entered formal judgment in favor of the Department, and Dillon timely appealed. We have jurisdiction of this appeal pursuant to A.R.S. § 12–2101(B); the appeal was assigned to Department T of this court pursuant to A.R.S. §§ 12–120.04 and 12–170(C).

## TIMELINESS OF THE DEPARTMENT'S ACTION UNDER A.R.S. § 42–124

■ Dillon first argues that the trial court erred in denying his motion to dis-

miss for lack of jurisdiction. He contends that, under A.R.S. § 42–124, the Department had 30 days following Dillon's receipt of the decision of the Board of Tax Appeals within which to appeal by filing an action in the tax court. Thus, Dillon contends, the Department's appeal filed 52 days after receipt was untimely. In response, the Department argues that A.R.S. § 42–124(A) and (B), when read together, provide that the Board's decision only becomes final 30 days after the taxpayer receives it, and that an action appealing the decision filed within 30 days thereafter is timely.

We agree with the Department. A.R.S. § 42–124 provides in part:

A. ... On determining the appeal the board shall issue a decision consistent with its determination. *The board's decision is final on the expiration of thirty days from the date when notice of its action is received by the taxpayer, unless either the department or the taxpayer brings an action in superior court as provided in subsection B.*

B. The department or a taxpayer aggrieved by a decision of the board may bring an action in superior court subject to the following provisions:

....

2. Except in the case of income tax, after payment of any tax, penalty or interest under protest and setting forth the grounds of objection to the legality of the tax, the taxpayer may bring an action against the department in superior court for the recovery of the tax, interest or penalty so paid under protest. In the case of income tax the taxpayer may bring an action against the department in superior court without paying the tax, penalty or interest under protest. *The action shall not begin more than thirty days after the order or decision of the board becomes final.* Failure to bring the action within thirty days constitutes a waiver of the protest and a waiver of all claims against this state arising from illegality in the tax, penalties and interest so paid.

(Emphasis added.) Subsection (A) provides that "[t]he board's decision is *final* on the

expiration of thirty days from the date when notice of its action is received by the taxpayer, unless either the department or the taxpayer brings an action in superior court as provided in subsection B." (Emphasis added.) Subsection (B)(2) commences the running of the 30–day period for the filing of an appeal to the superior court from the date the Board's decision "becomes" final. This "finality" clearly refers back to the special definition of "finality" established by subsection (A). Subsections (A) and (B) are *in pari materia,* and it is plain that the legislature intended the term "final" to carry the same meaning in both. Accordingly, the 30–day period provided by subsection (B)(2) for filing an action in superior court begins to run, pursuant to subsection (A), on the expiration of 30 days following the taxpayer's receipt of notice of the Board's decision.

Dillon, nevertheless, contends that subsection (B)(2) only provides an additional 30 days for actions filed by the taxpayer. Observing that the first two sentences of subsection (B)(2) focus exclusively on actions initiated by the taxpayer, he argues that interpreting the third sentence as applicable to actions filed by the Department would construe it out of context. A cursory reading of this subsection may be subject to that interpretation. However, the initial sentence of subsection (B) provides: "*The department* or a taxpayer aggrieved by a decision of the board *may bring an action in superior court subject to the following provisions....*" (Emphasis added.) The first two sentences of subsection (B)(2) set forth conditions applicable only to actions brought by a taxpayer. The third sentence, however, alone among the provisions of subsections (A) or (B), establishes a precise timeline for commencement of the action. Given that subsection (B)(2) applies expressly to both the Department and the taxpayer, we conclude that the third sentence was intended to apply to actions by both.

In this case, the Board's decision became "final" pursuant to A.R.S. § 42–124(A) on January 5, 1989, the thirtieth day following Dillon's counsel's receipt of notice of the Board's decision. The Department therefore had until February 4, 1989, to file an action. Because the Department timely filed its action on January 27, 1989, the tax court correctly denied Dillon's motion to dismiss.

## THE VALIDITY OF STATE LUXURY PRIVILEGE TAX ASSESSMENT AGAINST DILLON UNDER PRINCIPLES OF FEDERAL INDIAN LAW

### Introduction

Before dealing with the pertinent arguments of the parties, an overview of state/Indian law as it deals with taxation is in order. The federal law, which is controlling on this issue, has evolved from the view that Indian reservations were entirely beyond the reach of state law, *see Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832), to the view that state laws may be applied on Indian reservations unless their application would interfere with reservation self-government or impair a right granted or reserved by federal law. *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973).

In *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980), and *Ramah Navajo School Board, Inc. v. Bureau of Revenue of New Mexico,* 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982), the Supreme Court defined the rationale for determining whether a particular state tax law may be applied on an Indian reservation or to reservation Indians. In *Bracker,* the Court stated:

Congress has broad power to regulate tribal affairs under the Indian Commerce Clause, Art. 1, § 8, cl. 3.... This congressional authority and the "semi-independent position" of Indian tribes have given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members. First, the exercise of such authority may be pre-empted by federal law.... Second, it may unlawfully infringe "on the right of reservation Indians to make their own laws and

be ruled by them." ... The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members.

448 U.S. at 142–43, 100 S.Ct. at 2583 (citations omitted). The *Bracker* court also noted that, when on-reservation conduct involving only Indians is at issue, state law is generally inapplicable because the state's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest. *Id.* at 144, 100 S.Ct. at 2584. *See also Ramah Navajo School Bd.*, 458 U.S. at 838, 102 S.Ct. at 3398 (in determining whether state may exercise authority over tribal members or reservation activities, state's interest must be examined and given appropriate weight). The *Bracker* court continued:

> More difficult questions arise where ... a State asserts authority over the conduct of non-Indians engaging in activity on the reservation. In such cases we have examined the language of the relevant federal treaties and statutes in terms of both the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence. This inquiry is not dependent on mechanical or absolute conceptions of state or tribal sovereignty, but has called for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.

448 U.S. at 144–45, 100 S.Ct. at 2584. *See generally Peabody Coal Co. v. State*, 158 Ariz. 190, 761 P.2d 1094 (App.1988), *cert. denied*, 490 U.S. 1051, 109 S.Ct. 1967, 104 L.Ed.2d 435 (1989).

*Effect of Dillon's Status as Member of Puyallup Tribe Doing Business on Tohono O'Odham Reservation*

With these general principles in mind, we turn to the analysis required by federal law to determine the validity of Arizona's attempt to impose the tax at issue. In doing so, we first inquire where the incidence of the tax (i.e., the ultimate responsibility for paying the tax) lies. If the incidence of Arizona's luxury privilege tax falls on the consumer, then this case is controlled by the United States Supreme Court decision in *Colville*, and no further inquiry is required. However, the incidence of the luxury privilege tax imposed by A.R.S. §§ 42–1201 *et seq.*, which is an excise tax on the privilege of selling particular luxury items to customers for consumption, is on the vendor—in this case, a federally licensed Indian trader. Although Dillon is free to absorb the luxury tax expense or pass it on to the consumer, the ultimate responsibility for paying the tax remains with him. *Watkins Cigarette Serv., Inc. v. Arizona State Tax Comm'n*, 111 Ariz. 169, 526 P.2d 708 (1974).

Because the incidence of the tax falls on Dillon as a vendor, he argues that his status as an American Indian doing business on an Indian reservation precludes the state from imposing a tax on him whether or not he is a member of the dominant tribe. Dillon asserts that federal policy as expressed by Congress or in federal executive orders does not distinguish among Indians by tribal affiliation. Dillon also observes that the Presidential order that originally established the portion of the Tohono O'Odham Reservation on which the Dillon Tobacco Barn is now located set aside the specified land "for the use of the Papago and such other Indians as it may be desirable to place thereon." Executive Order of U.S. Grant, July 1, 1874. Dillon contends that, because he is an Indian whose presence on the Tohono O'Odham Reservation has been approved by both the tribal authorities and the Secretary of the Interior, he is entitled to the same immunity from state taxation that was afforded to the reservation Indians who challenged the application of the Arizona income tax in *McClanahan v. State Tax Commission of Arizona*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). We disagree.

*McClanahan* held that the state of Arizona had no jurisdiction to impose a tax on

the income of a Navajo Indian residing on the Navajo reservation whose income was wholly derived from reservation sources. Neither party in this appeal seriously disputes that *McClanahan* established a virtual immunity from direct state taxation for Indian tribes and member-reservation Indians. *See California State Bd. of Equalization v. Chemehuevi Indian Tribe,* 474 U.S. 9, 106 S.Ct. 289, 88 L.Ed.2d 9 (1985) (state could require Indian tribe to collect cigarette taxes from non-Indian purchasers at reservation shops and remit to state only if legal incidence of tax was on non-Indian purchasers). Accordingly, Dillon must prevail on this appeal if he falls within the scope of the state tax immunity accorded by *McClanahan.*

Contrary to Dillon's analysis, however, he does not. As Judge William C. Canby, Jr., recently stated in *American Indian Law* (2d Ed. nutshell series 1988):

> At the time *McClanahan* and prior cases restricting state taxation were decided, it was assumed that the restriction imposed upon the state was against taxing *any* Indian in Indian country, regardless of the tribal affiliation of that Indian. This assumption seemed justified both by the language of the decisions and the fact that for the purposes of civil and criminal jurisdiction the crucial fact has always been status as an Indian and not status as a tribal member. In 1980, however, the Supreme Court drew a sharp distinction between members of the tribe that governed a given reservation and other Indians not members of that tribe. In *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 1234 [134] [100 S.Ct. 2069, 65 L.Ed.2d 10] (1980), the Court held that the State of Washington could impose cigarette and sales taxes on sales made to non-member Indians in Indian country.

*Id.* at 207 (emphasis in original). As the *Colville* court stated:

> Federal statutes, even given the broadest reading to which they are reasonably susceptible, cannot be said to pre-empt Washington's power to impose its taxes on Indians not members of the Tribe.

> We do not so read the Major Crimes Act, 18 U.S.C. § 1153, which at most provides for federal court jurisdiction over crimes committed by Indians on another Tribe's reservation.... Similarly, the mere fact that nonmembers resident on the reservation come within the definition of "Indian" for purposes of the Indian Reorganization Act of 1934, 48 Stat. 988, 25 U.S.C. § 479, does not demonstrate a congressional intent to exempt such Indians from state taxation.

> Nor would the imposition of Washington's tax on these purchasers contravene the principle of tribal self-government, for the simple reason that nonmembers are not constituents of the governing Tribe. For most practical purposes those Indians stand on the same footing as non-Indians resident on the reservation. There is no evidence that nonmembers have a say in tribal affairs or significantly share in tribal disbursements. We find, therefore, that the State's interest in taxing these purchasers outweighs any tribal interest that may exist preventing the State from imposing its taxes.

447 U.S. at 160–61, 100 S.Ct. at 2085 (citations omitted).

Contrary to Dillon's assertion, this holding in *Colville* is not *dictum*. As the tax court's minute entry ruling correctly pointed out, the *Colville* opinion involved two separate cases, one of which involved sales of cigarettes on the Yakima Indian Reservation to Indians who were not members of the Yakima tribe. This tax was upheld. *See also Assiniboine & Sioux Tribes v. State of Montana,* 568 F.Supp. 269 (D.Mont.1983). Moreover, the Supreme Court has itself twice reaffirmed its statements in *Colville. See Duro v. Reina,* 495 U.S. 676, 686, 110 S.Ct. 2053, 2060, 109 L.Ed.2d 693 (1990) ("[e]xemption from state taxation for residents of the reservation ... is determined by tribal membership, not by reference to Indians as a general class"); *Rice v. Rehner,* 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983) (claim that state liquor license requirement for sales for off-premises consumption infringed tribal sovereignty held foreclosed as to

Indians not members of tribe with jurisdiction over reservation where sales occurred).

In our opinion, then, it is the tribal status of the individual upon whom the incidence of the tax falls that is relevant in determining the *McClanahan* tax exemption. Thus, Dillon's status as an Indian who was not a member of the Tohono O'Odham Tribe did not entitle him to immunity from the Arizona luxury privilege tax afforded by *McClanahan.*

*Preemption of Luxury Privilege Tax Due to Federal Licensure and Regulation of Indian Traders*

Dillon next argues that, even if his status does not exempt him from taxation, the federal government's comprehensive regulation of federal Indian traders, of which he is one, has left no room for the imposition of this tax. Moreover, he argues that Arizona provides no governmental services relating to his cigarette sales that would justify the tax despite its impairment of federal policies.

■ We reject Dillon's analysis and his conclusion. State jurisdiction over activities on Indian reservations is preempted by federal law only if it interferes or is incompatible with federal and tribal interests reflected in federal law. *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983); *Bien Mur Indian Market Center, Inc. v. Taxation and Revenue Dep't,* 108 N.M. 355, 772 P.2d 885 (App.1988), *rev'd in part on other grounds,* 108 N.M. 228, 770 P.2d 873 (1989).

■ Dillon is licensed as an Indian trader under 25 U.S.C. §§ 261–264, which exclusively govern trading with Indians and Indian tribes. Section 261 grants the Commissioner of Indian Affairs sole power to appoint traders to Indian tribes and to make rules and regulations specifying the kind and quantity of goods and prices at which goods shall be sold to Indians. Section 262 requires licensure of persons who wish to trade with Indians on reservations. Section 263 permits the President of the United States to prohibit the introduction of goods or particular articles into Indian country or to revoke all trading licenses and reject all applications for licenses to trade with a particular tribe. Section 264 prohibits trading with reservation Indians, with the exception of five named tribes, without a federal license. In this case, Dillon is not functioning as an "Indian trader" within the federal licensing scheme when he sells cigarettes to non-Indians and nonmembers of the Tohono O'Odham Tribe. Therefore, we perceive no federal policy embodied in 25 U.S.C. §§ 261–264 that is disturbed by Arizona's taxation of Dillon's cigarette sales to persons other than the reservation Indians with whom he is licensed to trade.

*Warren Trading Post* provides no support for Dillon's position. In that case, Arizona attempted to levy a two percent transaction privilege tax [1] on Warren Trading Post, a federally licensed Indian trader that conducted a retail business on the Navajo reservation. The only issue was whether the state could validly tax the proceeds of Warren Trading Post's on-reservation sales to Navajo Indians. 380 U.S. at 686 n. 1, 85 S.Ct. at 1243 n. 1. The Supreme Court held that the Arizona tax levy could not be made consistently with 25 U.S.C. §§ 261–264 and the implementing regulations of the Secretary of the Interior. The Court stated:

These apparently all-inclusive regulations and the statutes authorizing them would seem in themselves sufficient to show that Congress has taken the business of Indian trading on reservations so fully in hand that no room remains for state laws imposing additional burdens on traders.

380 U.S. at 690, 85 S.Ct. at 1245. The Court concluded:

We think the assessment and collection of this tax would to a substantial extent frustrate the evident congressional purpose of ensuring that *no burden shall be imposed upon Indian traders for trading with Indians on reservations* except as authorized by Acts of Congress or by valid regulations promulgated under

---

**1.** A.R.S. §§ 42–1301 *et seq.*

those Acts. This state tax on gross income would put financial burdens on appellant or the Indians with whom it deals in addition to those Congress or the tribes have prescribed, and could thereby disturb and disarrange the statutory plan Congress set up *in order to protect Indians against prices deemed unfair or unreasonable by the Indian Commissioner.* And since federal legislation has left the State with no duties or responsibilities respecting the reservation Indians, we cannot believe that Congress intended to leave to the State the privilege of levying this tax. *Insofar as they are applied to this federally licensed Indian trader with respect to sales made to reservation Indians on the reservation, these state laws imposing taxes cannot stand.*

*Id.* at 690–92, 85 S.Ct. at 1245–46 (emphasis added).

■ Contrary to Dillon's expansive interpretation, the holding in *Warren Trading Post* did not establish that federally licensed Indian traders could not be subjected to a state tax. As the quoted language from *Warren Trading Post* makes clear, state taxation of Indian traders is preempted only to the extent of their receipts from reservation sales to reservation Indians. *Accord Central Machinery Co. v. Arizona State Tax Comm'n,* 448 U.S. 160, 165, 100 S.Ct. 2592, 2596, 65 L.Ed.2d 684 (1980) (existence of Indian trader statutes "preempts the field of transactions with Indians occurring on reservations.") The state tax in *Warren Trading Post* was preempted because it attempted to tax the regulated trading relationship between the Indian trader and the reservation Indians for whose benefit the Indian trader statutes and regulations were adopted. In contrast, the Arizona luxury privilege tax in this case burdens only Dillon's lucrative commerce with non-Indians and nonmember Indians, and does not intrude into the federally regulated Indian trading relationship at all. *Cf. Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) (*Warren Trading Post* holding inapplicable where state sales tax was applied to sales by reservation Indian retailer to non-Indians and legal incidence of tax was on purchaser).

The New Mexico Court of Appeals has reached the same conclusion on similar facts. In *Bien Mur Indian Market,* a federally licensed trader that was owned by non-Indians operated a smokeshop as part of its trading post on Pueblo Indian land. The New Mexico Taxation and Revenue Department assessed the trader for gross receipts taxes on its sales of cigarettes to non-Indians. On appeal by the trader, the court upheld the tax, holding that the assessment was not federally preempted. The court stated:

Here, Bien Mur presented no evidence regarding federal legislation preempting the state's authority to tax. More importantly, the doctrine of presumption of federal preemption generally does not apply to the sale of goods by non-Indians to non-Indians on the reservation. *Cf. Rice v. Rehner,* 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983) (presumption of preemption exists if area of asserted authority is where tradition has recognized tribal sovereign immunity or inherent self-government). Accordingly, the state is not preempted from collecting state gross receipts taxes on the sale of cigarettes to non-Indians on the reservation.

772 P.2d at 890–91.

*Herzog Brothers Trucking, Inc. v. State Tax Commission,* 69 N.Y.2d 536, 516 N.Y.S.2d 179, 508 N.E.2d 914 (1987), on which Dillon relies, is similarly not dispositive. In that case, New York's former statutory scheme imposed a motor fuel sales tax on each retail sale in the state. The legal incidence of the tax was on the retail purchaser, but retail sellers were required to collect the tax as part of the price. Indian retail sellers on Indian reservations in that state refused to collect state motor fuel taxes. To avoid losing sales tax revenue on these sales, New York amended its law to replace the tax on retail sales of motor fuel with a new tax that was imposed on the first sale of motor fuel in the state. Under the new law, the taxes were collected directly from the fuel distributor

and included in the wholesale price. Motor fuel retailers were thus forced to pay the tax to purchase their inventory, and their retail prices necessarily included the tax. Where the ultimate consumer was an Indian, the state would refund that portion of the tax prepaid by the distributor and retailer.

Herzog Brothers Trucking was in the business of importing fuel into New York and distributing it to authorized Indian retail establishments on the reservations of the Seneca Nation. Herzog brought a declaratory judgment action challenging the state's authority to tax it on its wholesale sales to Indian retailers on Indian reservations. The trial court granted injunctive relief to Herzog, but the appellate division reversed. On appeal, the New York Court of Appeals reinstated the trial court's ruling, stating:

> [S]ince there is no dispute that plaintiff Herzog is a "trader" within the meaning of the Federal Indian trader laws, we must consider the Indian trader statutes, and the cases construing them, to determine if Federal law preempts the state tax at issue.

*Id.* at 544–45, 516 N.Y.S.2d at 184–85, 508 N.E.2d at 919. Relying on *Warren Trading Post* and *Central Machinery,* the court concluded:

> The Supreme Court cases construing the Indian trader statutes are dispositive. We determine that Congress has preempted the field of regulating trade with Indians on reservations and has left "no room" for the application of supplementary State tax laws, such as the one here at issue, that impose "additional burdens" on Indian traders.... Thus, no matter how minimal the burden imposed by the motor fuel taxation scheme on Herzog, as a trader to the Seneca Nation, such regulation is preempted by the Federal Indian trader laws and the Appellate Division erred, as a matter of law, in holding that plaintiffs had not established a "clear likelihood of success on the merits" on their application for a preliminary injunction.

*Id.* at 546, 516 N.Y.S.2d at 185–86, 508 N.E.2d at 920 (citations omitted).

In *Herzog Brothers Trucking,* the state of New York attempted to impose the challenged tax on a federally licensed Indian trader's sales to reservation Indians. In contrast, the state of Arizona seeks to tax only Dillon's sales to non-Indians and other nonmembers of the Tohono O'Odham Tribe. As our previous discussion indicates, the *Warren Trading Post* rationale invalidates a state tax only to the extent it burdens an Indian trader "with respect to sales made to reservation Indians on the reservation." 380 U.S. at 691–92, 85 S.Ct. at 1246. Because the New York motor fuel tax did precisely that, the New York Court of Appeals held it was federally preempted. Arizona's luxury privilege tax does not fall upon Dillon's cigarette sales to reservation Indians, and there is consequently no federal preemption.

*Hoopa Valley Tribe v. Nevins,* 881 F.2d 657 (9th Cir.1989), *cert. denied,* 494 U.S. 1055, 110 S.Ct. 1523, 108 L.Ed.2d 763 (1990), cited by Dillon, is also distinguishable. In that case, California imposed a timber yield tax on non-Indian purchasers of timber owned by the Hoopa Valley Tribe. Although the legal incidence of the tax was on the purchaser, standard timber industry practice was for the timber owner to bear the economic burden of the timber tax, and in fact the burden of the tax fell on the tribe. 881 F.2d at 660. Here, however, the economic burden of the Arizona luxury privilege tax does not fall on the Tohono O'Odham Tribe or any of its members.

In our opinion, federal law does not preempt the application of the Arizona luxury privilege tax to Dillon based upon his status as a federally licensed Indian trader.

*Infringement on the Sovereignty of the Tohono O'Odham Tribe*

■ Finally, we consider whether application of the Arizona luxury privilege tax to Dillon in this case must be invalidated on the independent ground that it unlawfully infringes on the right of the Tohono O'Odham Indians to make their own laws and be

ruled by them. Dillon argues that if he and other federal Indian traders must divert funds to the state's coffers, Tohono O'Odham commercial activity, and with it tribal self-government, will suffer. Dillon also argues that concurrent taxation by the state and by the tribe will result in his going out of business, which will diminish the tribe's tax base and impair tribal self-government.

Assuming that the Department's application of the Arizona luxury privilege tax in this case will force Dillon out of business, the economic impact of this action on the Tohono O'Odham Tribe is not legally sufficient to preclude application of the tax to Dillon. The United States Supreme Court's reasoning on an analogous set of facts in *Colville* fully answers Dillon's concerns over the sovereignty and independence of the Tohono O'Odham Tribe based upon the loss of revenues if the state tax is imposed:

The Tribes contend that their involvement in the operation and taxation of cigarette marketing on the reservation ousts the State from any power to exact its sales and cigarette taxes from non-members purchasing cigarettes at tribal smokeshops. The primary argument is economic. It is asserted that smokeshop cigarette sales generate substantial revenues for the Tribes which they expend for essential governmental services, including programs to combat severe poverty and underdevelopment at the reservations. Most cigarette purchasers are outsiders attracted onto the reservation by the bargain prices the smokeshops charge by virtue of their claimed exemption from state taxation. If the State is permitted to impose its taxes, the Tribes will no longer enjoy any competitive advantage vis-a-vis businesses in surrounding areas. Indeed, because the Tribes themselves impose a tax on the transaction, if the state tax is also collected the price charged will necessarily be higher and the Tribes will be placed at a competitive *disadvantage* as compared to businesses elsewhere. Tribal smokeshops will lose a large percentage of their cigarette sales and the Tribes will forfeit substantial revenues....

It is painfully apparent that the value marketed by the smokeshops to persons coming from outside is not generated on the reservations by activities in which the Tribes have a significant interest.... What the smokeshops offer these customers, and what is not available elsewhere, is solely an exemption from state taxation. The Tribes assert the power to create such exemptions by imposing their own taxes or otherwise earning revenues by participating in the reservation enterprises. If this assertion were accepted, the Tribes could impose a nominal tax and open chains of discount stores at reservation borders, selling goods of all descriptions at deep discounts and drawing custom[ers] from surrounding areas. We do not believe that principles of federal Indian law, whether stated in terms of pre-emption, tribal self-government, or otherwise, authorize Indian tribes thus to market an exemption from state taxation to persons who would normally do their business elsewhere.

. . . .

Washington does not infringe the right of reservation Indians to "make their own laws and be ruled by them" ... merely because the result of imposing its taxes will be to deprive the Tribes of revenues which they currently are receiving. The principle of tribal self-government, grounded in notions of inherent sovereignty and in congressional policies, seeks an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other.... While the Tribes do have an interest in raising revenues for essential governmental programs, that interest is strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services. The State also has a legitimate governmental interest in raising revenues, and that interest is likewise strongest when the tax is directed at off-reservation value and when the taxpayer is the recipient of state services. As we have already

**570**

noted, Washington's taxes are reasonably designed to prevent the Tribes from marketing their tax exemption to non-members who do not receive significant tribal services and who would otherwise purchase their cigarettes outside the reservations.

447 U.S. at 154–55, 156–57, 100 S.Ct. at 2081–82, 2083 (citations omitted). *See also Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. at 483, 96 S.Ct. at 1646 (reservation Indian cigarette retailer could be required to collect state sales tax imposed on non-Indian purchasers).

As in *Colville,* the Arizona luxury privilege tax is directed to sales of tobacco not grown on the reservation and made to non-reservation members. In our opinion, where the effect on tribal sovereignty is so negligible, the state of Arizona's legitimate governmental interest in raising revenues from Dillon's sales to persons other than reservation Indians will suffice to validate the tax.[2] Federal Indian law principles promoting tribal self-government would not authorize the Tohono O'Odham Tribe itself "to market an exemption from state taxation to persons who would normally do their business elsewhere," *Colville,* 447 U.S. at 155, 100 S.Ct. at 2082, and certainly it cannot be said that the tribe can authorize Dillon to do so. Indeed, because the burden of collecting and paying the Arizona luxury privilege tax falls on Dillon rather than the tribe or a tribal enterprise, Dillon's claim that the tax infringes on tribal sovereignty is even more attenuated than that of the unsuccessful tribes in *Colville.*

The Arizona luxury privilege tax is not invalid as applied to Dillon in this case.

Affirmed.

FIDEL, C.J., and GERBER, J., concur.

---

**2.** There is no due process or equal protection argument raised concerning the validity of the tax imposed.