Joan LaRock, Petitioner-Appellant-Petitioner,

v.

Wisconsin Department of Revenue, Defendant-Respondent.

Supreme Court

*No. 99–0951. Oral argument October 31, 2000.—Decided February 13, 2001.*

## 2001 WI 7

(Also reported in 621 N.W.2d 907.)

For the petitioner-appellant-petitioner there was a brief by *Gerald L. Hill, Jennifer L. Nutt Carleton* and *Oneida Law Office*, Oneida, and oral argument by *Gerald L. Hill* and *Jennifer Nutt Carleton*.

For the defendant-respondent the cause was argued by *F. Thomas Creeron, III,* assistant attorney general, with whom on the brief (in the court of appeals) was *James E. Doyle*, attorney general.

An amicus curiae brief was filed by *Brian L. Pierson, Donald E. Laverdure* and *von Briesen, Purtell & Roper, S.C.*, Milwaukee, and *Sheila D. Corbine* and *Ho-Chunk Nation Department of Justice*, Black River Falls, on behalf of the Oneida Indian Tribe of Wisconsin and Ho-Chunk Nation.

An amicus curiae brief was filed by *Gregory B. Conway, Jeffrey S. Dunn* and *Liebman, Conway, Olejniczak & Jerry, S.C.*, Green Bay, and *Sheldon E. Hochberg, John J. Duffy, Hilda A. Manuel* and *Steptoe*

& *Johnson, LLP,* Washington, D.C., on behalf of the Menominee Indian Tribe of Wisconsin.

An amicus curiae brief was filed by *Larry B. Leventhal* and *Leventhal & Associates,* Minneapolis, MN, and *Glenn C. Reynolds* and *Reynolds & Associates*, Madison, on behalf of the Lac Courte Oreilles Band of the Lake Superior Chippewa Indians and the Sokaogon Chippewa Community.

¶ 1. JON P. WILCOX, J. The question presented in this case is whether an enrolled member of the Menominee Tribe, Joan LaRock (LaRock), is exempt from Wisconsin's income tax while living and working on the Oneida Reservation. Because LaRock is a member of the Menominee Tribe rather than the Oneida Tribe, we conclude that principles of tribal sovereignty do not bar the State from taxing her income earned on the Oneida Reservation.

¶ 2. The Department of Revenue (DOR) sent notice to LaRock in 1996 that she owed $588.00 plus interest for income she earned in 1994 and 1995. LaRock appealed the DOR's finding to the Wisconsin Tax Appeals Commission (Commission) on the ground that she is an "Indian" living in "Indian country." Therefore, LaRock contended, she is exempt from state income tax under the United States Supreme Court holding in *McClanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164 (1973), which exempted an enrolled member of the Navajo Tribe living and working on the Navajo Reservation from Arizona's income tax. *Id.* at 181. The Commission rejected LaRock's argument and ruled that because she is not an enrolled member of the Oneida Tribe, she is not exempt from Wisconsin's income tax. The Circuit Court for Brown County, Don-

ald R. Zuidmulder, Judge, subsequently affirmed the Commission's order. The court of appeals then affirmed the holding of the circuit court.

I

¶ 3. The facts are undisputed for the purposes of this review. LaRock is an enrolled member of the Menominee Tribe. She married an enrolled member of the Oneida Tribe, with whom she had four children, all enrolled members of the Oneida Tribe. She subsequently divorced in 1993. For the taxable years 1994 and 1995, LaRock resided on the Oneida Reservation and worked for Oneida Bingo and Casino, which is also on the Oneida Reservation. The Oneida Bingo and Casino is wholly owned and operated by the Oneida Tribe. In 1994 and 1995, LaRock deducted her federal adjusted gross income from the state income tax based on her American Indian status. The DOR disallowed her deduction because she was not living and working on Menominee tribal lands. LaRock appealed the DOR's finding to the Commission.

¶ 4. Granting the DOR's motion for summary judgment, the Commission found "no Act of Congress, no treaty, no state statute or state agreement with any tribe that impairs Wisconsin's right to impose an income tax on enrolled members of a federally-recognized Indian tribe who live and work on the reservation of another tribe in Wisconsin." *LaRock v. Wisconsin Dep't of Revenue*, Wisconsin Tax Appeals Commission, No. 96–I–539, 15 (May 11, 1998). LaRock appealed and the circuit court affirmed the Commission's ruling, explaining that "since [LaRock] is not a member of the Oneida Nations, she enjoys no protected status that would allow her to claim immunity from the duty she owes as a citizen of the State of Wisconsin to pay

income taxes." LaRock then appealed the circuit court's ruling.

¶ 5. The court of appeals reviewed the treaties and federal statutes and asserted that those laws did not preempt state income tax jurisdiction in this instance. *LaRock v. Wisconsin Dep't of Revenue*, 2000 WI App 24, ¶ 9, 232 Wis. 2d 474, 606 N.W.2d 580 (Ct. App. 1999). The court then addressed *McClanahan* and the Supreme Court's use of the term "reservation Indian" therein. *Id.* at 484. The court reasoned that although the Supreme Court never defined that term, its ensuing opinions in *Washington v. Confederated Tribes of Colville*, 447 U.S. 134 (1980), and *Duro v. Reina*, 495 U.S. 676 (1990), distinguished between tribal members and nonmembers. *Id.* at 484–88. Thus, echoing the Commission, the court of appeals concluded that "no act of Congress, treaty, state statute or agreement with any tribe impairs Wisconsin's right to impose an income tax on enrolled members of a federally recognized Indian tribe that live and work on a reservation of another tribe." *Id.* at 494.

¶ 6. LaRock then petitioned this court for review. On April 28, 2000, we granted LaRock's petition.

II

¶ 7. The present case entails applying the law to undisputed facts. *See Anderson v. Wisconsin Dep't of Revenue*, 169 Wis. 2d 255, 262, 484 N.W.2d 914 (1992). Because this case presents a question of law, we are not bound by the Commission's conclusions. *Id.* Although the DOR asserts that the Commission has prior experience and has acquired general expertise in the area of Indian taxation, de novo review is appropriate because

there is no evidence that the agency used any special knowledge or expertise. *Id.*

¶ 8. Before applying the law to the facts of this case, it is necessary to consider the Indian sovereignty doctrine, which, as the United States Supreme Court has noted, "provides a backdrop against which the applicable treaties and federal statutes must be read." *McClanahan,* 411 U.S. at 172. First set forth by Chief Justice Marshall, the underlying principle of American Indian law is that Indian tribes are sovereign political entities. *See Worcester v. Georgia,* 31 U.S. 515 (6 Pet.) (1832). The United States Supreme Court has long recognized tribal rights and powers that are the accoutrements of sovereignty. *See, e.g., United States v. Winans,* 198 U.S. 371 (1905) (acknowledging fishing rights of Yakima Indians secured in 1859 treaty); *Winters v. United States,* 207 U.S. 564 (1908) (affirming rights of Gros Ventre and Assiniboing tribes to water from the Milk River); *Menominee Tribe v. United States,* 391 U.S. 404 (1968) (observing that tribal hunting and fishing rights from 1854 treaty survived Termination Act of 1954); *United States v. Wheeler,* 435 U.S. 313 (1978) (holding that Navajo Tribe has sovereign power to punish tribal member for committing a crime on the Navajo Indian Reservation in Arizona); *Red Bird v. United States,* 203 U.S. 76 (1906) (recognizing that the Cherokee Nation has the power to determine who is a member). We recently emphasized the enduring vitality of tribal sovereignty in *Teague v. Bad River Band of the Lake Superior Tribe of Chippewa Indians,* 2000 WI 79, ¶ 23, 236 Wis. 2d 384, 612 N.W.2d 709. Over the years, however, Indian tribes have seen their sovereignty tempered because "Congress has to a substantial degree opened the doors of reservations to state laws, in marked contrast to what

93

prevailed in the time of Chief Justice Marshall." *Organized Village of Kake v. Egan,* 369 U.S. 60, 74 (1962). The source of congressional power to do so "derives from federal responsibility for regulating commerce with Indian tribes and for treaty making." *McClanahan,* 411 U.S. at 172 n.7 (citations omitted). Consequently, the notion of the "tribe," grounded in our federal constitution, is the essential political unit in American Indian law. *See* U.S. Const. art. I, § 8, cl. 3; art. II, § 2, cl. 2. Moreover, federal legislation over the past century has sought in some instances to encourage tribal coherence.[1] Congress can pass legislation based on tribal status without running afoul of the equal protection clause because a "tribe" is a political rather than racial classification. *See Morton v. Mancari,* 417 U.S. 535, 554 (1974) (holding that a BIA hiring preference is not a "racial preference" because it is "granted to Indians not as a discrete racial group, but, rather, as member of quasi-sovereign tribal entities . . ."). Thus, it is against this backdrop of tribal sovereignty that we examine the power of Wisconsin to tax the income of LaRock.[2]

---

[1] *See* Indian Reorganization Act of 1934, 25 U.S.C. §§ 461–479 (2000). Pursuant to 25 U.S.C. § 476, "[a]ny Indian tribe shall have the right to organize for its common welfare . . . ." Therefore, the Indian Reorganization Act of 1934 fosters self-government and sets forth a mechanism for federal recognition, which establishes the quasi-sovereign status of each tribe under federal law. *See* 25 U.S.C. §§ 476–479.

[2] The term "tribe," as used in this opinion, refers to one of the 556 federally recognized Indian tribes, each of which are distinct political units. Indian Entities Recognized and Eligible to Receive Services From the United States Bureau of Indian Affairs, 65 Fed. Reg. 13298–01 (Mar. 13, 2000). This list indicates that the Menominee Indian Tribe of Wisconsin is a political unit distinct from the Oneida Tribe of Wisconsin, which

¶ 9. Wisconsin requires that "[f]or the purpose of raising revenue for the state and the counties, cities, villages and towns, there shall be assessed, levied, collected and paid a tax on all net incomes of individuals. . .by every natural person residing within the state." Wis. Stat. § 71.02 (1993–94).[3] The United States Supreme Court has observed that "[e]njoyment of the privileges of residence within the state, and the attendant right to invoke the protection of its laws, are inseparable from the responsibility for sharing the costs of government." *Lawrence v. State Tax Comm'n*, 286 U.S. 276, 279 (1932). Relying on the Supreme Court's *McClanahan* decision, however, LaRock contends that she is exempted from the statutory obligation to pay state income tax. Accordingly, we begin our analysis of her argument by reviewing the Supreme Court's *McClanahan* decision.

¶ 10. *McClanahan* is widely regarded as the seminal case in the area of American Indian income

is in turn distinct from the Oneida Nation of New York. *Id.* It is, of course, undisputed in this case that the Menominee Indian Tribe of Wisconsin is distinct from the Oneida Tribe of Wisconsin. However, at oral arguments, counsel for LaRock noted that there are six "bands of Chippewa" in Wisconsin and questioned whether the six "bands" would be considered one tribe. The Bureau of Indian Affairs' list indicates that several Indian "bands" are distinct political units; therefore, they are separate federally recognized Indian tribes. *Id.* For example, the Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin is a federally recognized tribe distinct from the Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin. *Id.*

[3] All subsequent references to the Wisconsin Statutes are to the 1993–94 version unless otherwise indicated.

taxation.[4] There, the Court was required "to reconcile the plenary power of the States over residents within their borders with the semi-autonomous status of Indians living on tribal reservations." *McClanahan*, 411 U.S. at 165. In *McClanahan*, an enrolled member of the Navajo tribe, living and earning her income on the Navajo reservation in Arizona, requested a refund for all of the money withheld from her wages to cover her state income tax liability. *Id.* at 165–66. The Court noted that "this case involves the narrow question whether the State may tax a reservation Indian for income earned exclusively on the reservation." *Id.* at 168. After surveying the development of American Indian law over the last two hundred years, the Court set forth the touchstone of recent cases: "[t]he modern cases thus tend to avoid reliance on platonic notions of Indian sovereignty and to look instead to the applicable treaties and statutes which define the limits of state power." *Id.* at 172. The Court then observed that in light of the 1868 treaty between the Navajo Nation and the United States Government, "it cannot be doubted that the reservation of certain lands for the exclusive use and occupancy of the Navajos and the exclusion of non-Navajos from the prescribed area was meant to establish the lands as within the exclusive sovereignty of the Navajos under general federal supervision." *Id.* at 174–75. The Court further noted that "since the signing of the Navajo treaty, Congress has consistently acted upon the assumption that the State lacked jurisdiction over Navajos living on the reservation." *Id.* at 175. Based on this two-fold analysis, the Court concluded that Arizona did not have jurisdiction to impose

---

[4] *See, e.g.*, Sandra Hansen, *Survey of Civil Jurisdiction in Indian Country 1990*, 16 Am. Indian L. Rev. 356, 358 (1991) (referring to *McClanahan* as a "landmark decision").

a tax on the income of a Navajo living on a Navajo reservation. *Id.* at 181. *McClanahan*, therefore, stands for the proposition that a state may not impose an income tax upon tribal members living and working on their own tribal lands.

■

¶ 11. Since *McClanahan*, the Supreme Court has further delineated the fundamental principles of tribal sovereignty and the mode of analysis for lower courts to utilize when tribal sovereignty is invoked. *See Colville*, 447 U.S. 134 (distinguishing between nonmember Indians on the lands of another tribe and tribal members on their own lands in the state taxation context); *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980) (setting forth the inquiry to determine whether a state can regulate tribal activity on tribal lands); *Duro*, 495 U.S. 676 (distinguishing between nonmember Indians on the lands of another tribe and tribal members on their own lands in the criminal jurisdiction context); *Oklahoma Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114 (1993) (characterizing *McClanahan* as a case "in which the Court held that a State could not subject a tribal member living on the reservation, and whose income derived from reservation sources, to a state income tax absent an express authorization from Congress"). We glean two tenets from these post-*McClanahan* cases that are relevant to the present facts: (1) there is a distinction between nonmember Indians on the lands of another tribe and tribal members living on their own tribal lands; and (2) state authority may be asserted over American Indians on all tribal lands where the exercise of such authority does not conflict with federal law or treaties and it does

not unlawfully infringe on the right of reservation Indians to make their own laws and be ruled by them.[5]

## III

¶ 12. The first post-*McClanahan* Supreme Court case that explicitly marked the distinction between nonmember Indians living on the lands of another tribe and tribal members living on their own tribal lands was *Washington v. Confederated Tribes of Colville*, 447 U.S. 134 (1980). There, the Court confronted the issue of whether the State of Washington could impose sales and use taxes upon American Indians on the reservation of another tribe. The Court, noting that it was apparent after "McClanahan that the sales tax could not be applied to similar purchases by tribal members," reasoned that "[f]ederal statutes, even given the broadest reading to which they are reasonably suscep-

---

[5] This second tenet is the analysis set forth in *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142 (1980), which confronted the question of whether Arizona (a Public Law 280 state for limited purposes) had the power to impose a motor carrier license and use taxes on a logging company for its logging and hauling operations performed solely on the Fort Apache Reservation. We note that Wisconsin is a Public Law 280 state and this same analysis might not apply to non-Public Law 280 states. Public Law 280 is primarily a grant of state criminal jurisdiction over offenses committed by or against Indians on the reservations to six states, including Wisconsin, and other states at their option. *See Bryan v. Itasca County*, 426 U.S. 373, 379–87 (1976). In *Bryan*, the Supreme Court ruled that the grant of civil jurisdiction in Public Law 280 did not grant Minnesota the power to tax "reservation Indians" in contrast to *McClanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164 (1973). *Id.* at 390. However, neither the Supreme Court's ruling in *Bryan* nor Public Law 280 prohibit a state from taxing non-reservation Indians. *See* ¶ 23.

tible, cannot be said to pre-empt Washington's power to impose its taxes on Indians not members of the Tribe." *Id.* at 160. Further tracing the distinction between nonmember Indians on the lands of another tribe and tribal members on their own lands, the Court addressed the issue of tribal sovereignty:

> Nor would the imposition of Washington's tax on these purchasers contravene the principle of tribal self-government, for the simple reason that nonmembers are not constituents of the governing Tribe. For most practical purposes those [nonmember resident] Indians stand on the same footing as non-Indians resident on the reservation. There is no evidence that nonmembers have a say in tribal affairs or significantly share in tribal disbursements. We find, therefore, that the State's interest in taxing these purchasers outweighs any tribal interest that may exist in preventing the State from imposing its taxes.

*Id.* at 161. The Court, therefore, in the context of state taxation, highlighted the demarcation between nonmember Indians who are on the lands of another tribe and tribal members on their own tribal lands.

¶ 13. LaRock, however, attempts to obscure the line between nonmember Indians on the lands of another tribe and tribal members on their own tribal lands, arguing that *Colville* involved the taxation of goods and is so confined to its facts. While *Colville* did involve sales and use taxes rather than an income tax, this is a distinction without a difference. The central issue in *Colville* was whether the state had the power to tax a nonmember Indian on another tribe's lands; the nature of the tax was immaterial. Thereby the Supreme Court established a bright-line test for determining whether an individual may participate in the

accoutrements of sovereignty when he or she is on tribal lands: whether the individual is an enrolled member of that tribe.

¶ 14. This interpretation of *Colville* is in accord with other jurisdictions. Prior to *Colville*, several jurisdictions did hold that *McClanahan* exempted all American Indians on any tribal lands from state taxation. *See Fox v. Bureau of Revenue*, 531 P.2d 1234, 1234–35 (N.M. Ct. App. 1975); *LaRoque v. Montana*, 583 P.2d 1059, 1063 (Mont. 1978); and *Topash v. Commissioner of Revenue*, 291 N.W.2d 679, 680–81 (Minn. 1980). However, after the Court handed down *Colville*, *Fox* was explicitly overruled by *New Mexico Taxation and Revenue Dep't v. L.R. Greaves*, 864 P.2d 324, 325 (N.M. Ct. App. 1993); *LaRoque* was rendered invalid by the passage of Mont. Admin. Reg. § 42.15.121(1); and most recently, *Topash* was abrogated by *Minnesota v. R.M.H.*, 617 N.W.2d 55, 64 (Minn. 2000). Thus, New Mexico, Montana, and Minnesota have all revisited this same issue in light of *Colville* and recognized the distinction between a nonmember Indian on the lands of another tribe and tribal members on their own lands. Moreover, Arizona applied *Colville* to find the same distinction in *State ex rel. Arizona Dep't of Revenue v. Dillion*, 826 P.2d 1186, 1191 (Ariz. Ct. App. 1991). Indeed, the only jurisdictions that provide nonmember Indians on the lands of another tribe with the same *McClanahan* tax-exempt status as tribal members on their own tribal lands are those such as Oregon and Idaho, which have statutes granting an income tax exemption for all American Indians on Indian lands within their borders, or North Dakota, which has not confronted the issue since *Colville*. *See* Or. Rev. Stat. § 316.777 (1999); Idaho Code § 63–3026A(4)(b)(iv) (2000); *White Eagle v. Dorgan*, 209 N.W.2d 621 (N.D.

1973). Consequently, we do not accept the argument that *Colville* is confined to the subject of state sales and use taxes; instead, we regard it as a watershed case that further clarifies the general principles set forth in *McClanahan*.

¶ 15. The fact that the Supreme Court declined to confine the distinction between nonmember Indians and tribal members to state sales and use tax cases is apparent from the second case where the same distinction was raised, albeit in a different context. In *Duro v. Reina*, 495 U.S. 676, 679 (1990), the Supreme Court considered whether the Salt River Pima-Maricopa Indian Community—a recognized Tribe with an enrolled membership—had criminal jurisdiction over Albert Duro, an enrolled member of the Torres-Maricopa Band of the Cahuilla Mission Indians, where he allegedly shot and killed a fourteen-year-old boy within the Salt River Reservation. Analyzing the power of the Pima-Maricopa Tribe to prosecute Duro, the Court reasoned that "the retained sovereignty of the tribes is that needed to control their own internal relations, and to preserve their own unique customs and social order." *Id.* at 685–86. But this retained sovereignty was not implicated in the case of a nonmember Indian—who could not participate in the tribal government—committing a crime on another tribe's lands. *Id.* at 688. In so deciding, the Court again addressed the issue at hand:

> The distinction between members and nonmembers and its relation to self-governance is recognized in other areas of Indian law. Exemption from state taxation for residents of a reservation, for example, is determined by tribal membership, not by reference to Indians as a general class. We have held that States may not impose certain taxes on trans-

actions of tribal members on the reservation because this would interfere with internal governance and self-determination. But this rational does not apply to taxation of nonmembers, even where they are Indians.

*Id.* at 686–87 (citation omitted). Therefore, the Court reasserted the holding of *Colville* in determining that the sovereignty retained by Indian tribes does not include criminal jurisdiction over nonmember Indians, although it does include, of course, criminal jurisdiction over tribal members on their own tribal lands. *Id.* at 694.

¶ 16. However, the Pima-Maricopa Tribe raised the concern that if the Court did not grant it criminal jurisdiction over nonmember Indians on its tribal lands, "the tribes will lack important power to preserve order on the reservation, and nonmember Indians will be able to violate the law with impunity." *Id.* at 696. The Court responded to the Pima-Maricopa's concern by asserting that "[i]f the present jurisdictional scheme proves insufficient to meet the practical needs of reservation law enforcement, then the proper body to address the problem is Congress, which has the ultimate authority over Indian affairs." *Id.* at 698. Congress responded to the Court's invitation by passing the "Duro fix," which granted tribes criminal jurisdiction over nonmember Indians on tribal lands. 25 U.S.C. § 1301(2) (2000).

■

¶ 17. LaRock, by looking to committee reports and legislative history, argues that the "Duro fix" not only overturned the United States Supreme Court's decision in *Duro*, but mandated that a state has no inherent jurisdiction over nonmember Indians within Indian country. LaRock's argument fails for three rea-

sons. First, Congress did precisely what the Supreme Court invited it to do in *Duro*; there was no question that Congress was within its authority in passing such legislation. Although Congress granted "Indian tribes" jurisdiction over Indians committing a crime on their tribal lands, it does not follow that Congress eliminated the distinction between Indian tribes. 25 U.S.C. § 1301(2). To the contrary, if Congress intended to erase this distinction, it could have done so explicitly in the legislation. Second, Congress has not acted to overturn *Colville*, which unlike *Duro*, is within the context of the present case—state taxation. Of course, the Wisconsin Legislature could act to grant such an exemption, but so far has refrained from doing so, in contrast to the state legislatures in Oregon and Idaho. Finally, the Supreme Court, while indicating that it was cognizant of the "Duro fix," repeated the rule of its "pathmaking case" of *Montana v. United States*, 450 U.S. 544, 564 (1981), which defined the limits of tribal sovereignty:

> 'Indian tribes retain their inherent power [to punish tribal offenders,] to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members. . .but [a tribe's inherent power does not reach] beyond what is necessary to protect tribal self-government or to control internal relations.'

*Strate v. A–1 Contractors*, 520 U.S. 438, 446 n.5, 459 (1997) (bracketed material in the original). The Court, as evidenced by this recent reiteration of the *Montana* rule in a case fourteen years after the "Duro fix," has held since *McClanahan* that membership in a tribe, not ethnic status as an American Indian, is the integral fact that brings inherent tribal sovereignty into play.

Thus, the distinction between nonmember Indians on the lands of another tribe and tribal members on their own lands—as stressed in *Colville* and reasserted in *Duro*—remains valid.

## IV

¶ 18. The fact that neither Congress nor the Wisconsin Legislature has acted to grant the exemption indicates that the State is not preempted from taxing LaRock. The applicable analysis was set forth in *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980), which followed *Colville* and confronted the issue present here: whether the state has jurisdiction to regulate and tax activity occurring on tribal lands.[6]

---

[6] LaRock urges this court to employ the "categorical approach" outlined in the United States Supreme Court decision *County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation*, 502 U.S. 251, 258 (1992). This approach is that " 'absent cession of jurisdiction or other federal statutes permitting it,' we have held, a State is without power to tax reservation lands and reservation Indians." *Id.* (citation omitted). However, this "categorical approach" is only utilized "when a State attempts to levy a tax directly on an Indian tribe or *its members* inside Indian country, rather than on non-Indians . . . ." *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 458 (1995) (emphasis added). LaRock is not a member of the Oneida tribe; therefore, the categorical analysis would be inappropriate. This is in accord with the Supreme Court's conclusion that nonmember Indians resident on another tribe's lands have the same status as non-Indians resident on tribal lands in *Washington v. Confederated Tribes of Colville*, 447 U.S. 134, 161 (1980). As noted above, there the Court discussed whether the imposition of a tax on a nonmember Indian on another tribe's lands "contravene[s] the principle of tribal self-government." *Id.* The Court concluded that the tax would not do

The threshold question is whether the exercise of state authority is pre-empted by federal law. *Id.* at 142. The second question is whether state authority "infringe[s] 'on the right of reservation Indians to make their own laws and be ruled by them.' " *Id.*

### A

¶ 19. As for the first inquiry, LaRock asserts that "the Treaties that established the Oneida Reservation preclude the extension of State income tax law to Indians on the Oneida Reservation." An examination of the treaties between the Oneida Tribe and the United States does not support her conclusion. LaRock has referred us to an 1831 treaty between the United States and the Menominee Tribe, an 1838 treaty between the United States and the Oneida Tribe, as well as an 1822 treaty between the United States, the Menominee Tribe, and the Oneida Tribe. *See* Treaty of February 8, 1831, between the Menominee Tribe and the United States; Treaty of February 3, 1838, between the Onieda Tribe and the United States; Treaty of September 23, 1822, between Oneida, Stockbridge, Tuscaroara, St. Regis, Munusee and Menominee Tribes of Indians. In none of the treaties to which LaRock has referred us is taxation mentioned. Nor do they imply that a nonmember is exempt from state taxation while on another tribe's lands. Therefore, they do not provide a basis to preempt Wis. Stat. § 71.02.

¶ 20. LaRock further suggests that a "sister-Tribe relationship" exists between the Menominee Tribe and the Oneida Tribe as evidenced by "Treaties

so because "non-members are not constituents of the governing Tribe. For most practical purposes those Indians stand on the same footing as non-Indians resident on the reservation." *Id.*

in 1821 and 1822" between the two tribes. According to the 1822 Treaty, which is the only treaty between the Menominee Tribe and the Oneida Tribe that LaRock has cited, the Menominee Tribe ceded some tribal lands to the Oneida Tribe and retained some limited rights to enjoy the ceded lands, but the treaty does not create dual-sovereignty over their respective lands. *See* Treaty of September 23, 1822, between Oneida, Stockbridge, Tuscaroara, St. Regis, Munusee and Menominee Tribes of Indians. It is undisputed that LaRock is an enrolled member of the Menominee Tribe, living and working on Oneida lands. LaRock does not assert that she has any more voice in Oneida tribal affairs than a non-Indian or that this "sister-relationship" between the two tribes gives her any voice in Oneida tribal affairs. Indeed, at oral argument, counsel for LaRock admitted that the cessation of Menominee land to the Oneida Tribe only indicates that the Menominee Tribe has a relationship with the Oneida Tribe. The tribes do not grant dual-memberships.

¶ 21. LaRock next contends that the definition of "Indian country" in 18 U.S.C. § 1151—when read in conjunction with *McClanahan*—supports the proposition that Wis. Stat. § 71.02 has been preempted by federal law, thereby preventing the State from taxing her income. LaRock maintains that "[i]t is the creation and oversight of Indian country that the Federal government preempts the State's ability to tax Indian tribes and individuals." We reject her argument. The language of 18 U.S.C. § 1151, within the Indian Crimes Act, defines "Indian country" as:

> [T]he term 'Indian country' as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United

States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

Drafted in 1948, the nomenclature "Indian country," although it has been used in a civil context,[7] refers to the various types of Indian lands for the purposes of the Indian Crimes Act. The need for such a nomenclature is apparent when the various forms of Indian lands, created by the dramatic reversals in federal Indian policy over the years, are considered. *See Egan*, 369 U.S. at 72–74 (tracing the history of the discombobulated federal Indian policy, which includes the establishment of allotments, dependent communities and other forms of Indian lands). Therefore, when Congress decided to pass criminal legislation for all Indian lands, it chose the term "Indian country" and included within the definition the various forms of Indian lands in the United States. Such a definition, however, does not preempt the State either explicitly or implicitly from taxing the income of a nonmember American Indian residing on the lands of another tribe. When read with the aforementioned Supreme Court caselaw, it is clear that the Supreme Court—in *Colville* and again in *Duro*—drew a distinction between nonmembers on the lands of another tribe and tribal members on their own tribal lands. LaRock has not cited any

---

[7] *See Oklahoma Tax Comm'n v. Sac and Fox Nation*, 508 U.S. 114, 123 (1993).

other federal law as having preempted the State from imposing income tax in such a situation. And we find no federal law—including treaties, statutory provisions, and caselaw—that preempts the State from imposing an income tax on a nonmember Indian living on another tribe's lands.

## B

¶ 22. The second area of inquiry is whether State authority will infringe upon the right of reservation Indians to make their own laws and be ruled by them. *Bracker*, 448 U.S. at 142. This inquiry is targeted at whether the tribe's sovereignty is restricted by the imposition of the tax. Therefore, we must begin by ascertaining the meaning of the term "reservation Indian." In *McClanahan*, the Supreme Court employed the term "reservation Indian" in order to distinguish those facts from its holding in *Egan*, 369 U.S. 60, which "came in the context of a decision concerning the fishing rights of nonreservation Indians." *McClanahan*, 411 U.S. at 176 n.15. LaRock, however, turns to this court's definition of a "reservation Indian" in *Anderson*, where we said that "the term 'reservation Indian' refers to an Indian living on the reservation." 169 Wis. 2d at 276. This definition, LaRock argues, encompasses her because she "is an Indian that lives on a Reservation, the Oneida Reservation." In *Anderson*, however, we were referring to the specific reservation of the particular tribe in which Anderson was enrolled: the Lac Courte Oreilles Band of the Lake Superior Chippewa Indians. *Id.* at 276, 260. LaRock attempts to stretch this definition to include all Indian reservations, a proposition for which she provides no authority. Inasmuch as LaRock is not an enrolled member of the Oneida Tribe living on the Oneida Reservation, she is not a

"reservation Indian" as that term is used in United States Supreme Court precedent or in our *Anderson* decision.

¶ 23. It is because LaRock is not an enrolled member of the Oneida Tribe that the tribal sovereignty of the Oneidas is not implicated. The fact is that LaRock—who is an enrolled member of the Menonminee Tribe—has no voice in the affairs of the Oneida Tribe as she may in the affairs of the Menominee Tribe. Nor does she have an expectation of having a voice in Onieda Tribal affairs as her children, who are enrolled members of the Oneida Tribe, may have. She merely asserts that she is an "Indian" residing in "Indian country" and therefore is exempt from the State's income tax. While it is undisputed that she is an American Indian, her ethnicity does not confer upon her any more rights or privileges within the Oneida Tribe than a non-Indian has within the Oneida Tribe. Therefore, we do not find that the State is preempted from imposing an income tax on LaRock.

V

¶ 24. In conclusion, we hold that the State is not barred by principles of tribal sovereignty from taxing LaRock's income because, although she is an enrolled member of the Menominee Tribe, she is not an enrolled member of the Oneida Tribe. We therefore affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 25. DAVID T. PROSSER, J., did not participate.