John A. ANDERSON, Petitioner-Appellant-Petitioner,

v.

Wisconsin DEPARTMENT OF REVENUE. Respondent-Respondent.

Supreme Court

*No. 91–0167. Oral argument May 28, 1992.—Decided June 23, 1992.*

(Also reported in 484 N.W.2d 914.)

256

For the petitioner-appellant-petitioner there briefs by *Michael D. Flanagan* and *Foley & Lardner,* Milwaukee and oral argument by *Mr. Flanagan.*

For the respondent-respondent the cause was argued by *Gerald S. Wilcox,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

LOUIS J. CECI, J.   This case is before the court on petition for review of a published decision of the court of appeals, *Anderson v. Dept. of Revenue,* 163 Wis. 2d 1015, 473 N.W.2d 520 (Ct. App. 1991). The court of appeals affirmed a judgment of the circuit court for Sawyer County, Alvin L. Kelsey, Circuit Judge, which had affirmed a decision and order of the Wisconsin Tax Appeals Commission (the commission). The commission had determined that John A. Anderson (Anderson), an enrolled member of the Lac Courte Oreilles Band of the Lake Superior Chippewa Indians (the tribe), owed income taxes for income he earned on the Lac Courte Oreilles reservation (the reservation). The issue presented is whether the state of Wisconsin has the authority to tax the income of a member of the tribe, earned from tribal educational activities conducted on the reservation, when the member lives off the reservation. We hold that it does.

The relevant facts are as follows. Anderson is an enrolled member of the tribe. Anderson did not file Wisconsin income tax returns for the years 1980–83. During those years, Anderson lived in Hayward, Wisconsin, and was employed in various educational capacities by the tribe on the reservation. From 1980 to August 1982, he served as a guidance counselor at the tribe's high school,

as director of education for the tribe, and as public information officer for the tribe's elementary and high schools. From August 1982 until the end of 1983 he served as president of the Lac Courte Oreilles Community College.

The Department of Revenue (the department) issued a notice of assessment against Anderson based upon the department's estimate of his income for the years 1980–83. Anderson filed a petition for redetermination of that estimate, which was denied. Anderson then filed a petition for review of the department's action with the commission.

Anderson subsequently filed Wisconsin individual income tax returns for the years 1980–83. On those returns, he identified his income earned from investment income and outside speaking income as taxable by the state, but subtracted his wages earned on the reservation as nontaxable.

At the hearing before the commission, Anderson contended that he had no obligation to pay Wisconsin state income taxes on the wages he earned while employed by the tribe on the reservation. The commission did not agree and determined that because Anderson lived off the reservation, his income was subject to the state income tax. The commission therefore affirmed the department's assessment against Anderson.

Anderson argues that Wisconsin's ability to tax his on-reservation income is preempted by federal law, that the tax places an impermissible burden on the tribe and infringes on the tribe's sovereignty, and that the tax is contrary to the Supreme Court's decision in *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164 (1973). The department responds that because Anderson is a resident of the state and not the reservation, his income is subject to taxation; that the state's ability to tax

Anderson's income is not preempted by federal law; that the tax does not impermissibly burden the tribe nor infringe upon the tribe's sovereignty; and that the tax does not violate *McClanahan.* We agree with the department's arguments.

This case involves the application of law to undisputed facts. Because this is a question of law, we are not bound by the commission's conclusions. *Local No. 695 v. LIRC,* 154 Wis. 2d 75, 82, 452 N.W.2d 368 (1990). As this is a case of first impression and there is no evidence that the commission has any special expertise or experience in deciding the issue presented by this case, we give the commission's determination no weight and review its decision *de novo. Id.* at 84.

Wisconsin may levy an income tax on all citizens domiciled within the state, as "domicile in itself establishes a basis for taxation." *Lawrence v. State Tax Comm.,* 286 U.S. 276, 279 (1932). "Enjoyment of the privileges of residence within the state, and the attendant right to invoke the protection of its laws, are inseparable from the responsibility for sharing the costs of government." *Id.* Pursuant to this authority to tax, Wisconsin imposes a personal income tax upon "every natural person residing within the state . . .." Section 71.01(1), Stats. 1983-84. In Wisconsin, all income of resident individuals follows the residence of the individual. Section 71.07(1), Stats. Therefore, because Anderson lives in Hayward, Wisconsin, and not on the reservation, he is subject to the state income tax on all of his income, whether earned in this state or elsewhere. *See Dromey v. Tax Comm.,* 227 Wis. 267, 273, 278 N.W. 400 (1938). As the income tax is nondiscriminatory, it applies to Indians outside the reservation unless pre-

empted. *See Webster v. Department of Revenue,* 102 Wis. 2d 332, 337, 306 N.W.2d 701 (Ct. App. 1981).

Anderson argues that Wisconsin's ability to tax his on-reservation income is preempted by federal law and that the court of appeals erred in its analysis of *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136 (1980), and *Ramah Navajo School Bd. v. Bureau of Revenue,* 458 U.S. 832 (1982). We do not agree.

Under the preemption analysis developed by the U.S. Supreme Court in federal Indian law cases, we must avoid rigidly applying "mechanical or absolute conceptions of state or tribal sovereignty . . .." *White Mountain,* 448 U.S. at 145. "[Q]uestions of pre-emption in this area are not resolved by reference to standards of pre-emption that have developed in other areas of the law . . .." *Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 176 (1989). Rather, we must apply "a flexible pre-emption analysis sensitive to the particular facts and legislation involved." *Id.* We must therefore conduct "a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *White Mountain,* 448 U.S. at 145. "[A]mbiguities in federal law should be construed generously, and federal pre-emption is not limited to those situations where Congress has explicitly announced an intention to pre-empt state activity." *Ramah,* 458 U.S. at 838.

The state has an interest in ensuring that all residents of the state bear their responsibility for sharing the costs of government. Wisconsin has imposed an income tax upon all residents, and upon Anderson in this case, to help bear the cost of government. Here, the

state is seeking to assess its tax in return for the governmental functions the state provides to those who must bear the burden of paying the tax. We find that this is a vital state interest.

In contrast to the vital state interests at stake in this case, the federal interests implicated here are minimal. Anderson attempts to characterize the federal interests at stake here as significant by comparing this case to *White Mountain* and *Ramah,* where the U.S. Supreme Court found state taxes preempted. For the reasons stated below, we find that Anderson's comparison fails.

In *White Mountain,* the Supreme Court held that a state motor carrier license tax and a state excise use fuel tax levied upon a logging company whose activities were performed solely on an Indian reservation were preempted by the pervasive federal regulatory scheme governing timber operations on Indian reservations. The Court noted that "the Federal Government's regulation of the harvesting ·of Indian timber is comprehensive. That regulation takes the form of Acts of Congress, detailed regulations promulgated by the Secretary of the Interior, and day-to-day supervision by the Bureau of Indian Affairs." *White Mountain,* 448 U.S. at 145. The Court noted that timber on Indian land may be sold only with the consent of the Secretary of the Interior, and the Secretary is granted power to determine the disposition of the proceeds from timber sales. *Id.* at 146.

The Secretary had promulgated "a detailed set of regulations" with the objective of "promoting self-sustaining communities, to the end that the Indians may receive from their own property . . . the benefit of whatever· profit it is capable of yielding . . .." *Id.* at 146–47. The regulations governed almost every aspect of the timber operations, and the Court noted that "the Bureau of Indian Affairs exercises literally daily supervi-

sion over the harvesting and management of tribal timber." *Id.* at 147. In addition, the state tax was being imposed for operations that were being conducted solely upon Bureau and tribal roads. *Id.* at 148.

The Court held that there was "no room for these taxes in the comprehensive federal regulatory scheme. In a variety of ways, the assessment of state taxes would obstruct federal policies. And equally important, respondents have been unable to identify any regulatory function or service performed by the State that would justify the assessment of taxes for activities on Bureau and tribal roads within the reservation." *Id.* at 148–49. The Court reiterated that *White Mountain* was not a case in which the state was seeking to assess taxes in return for governmental functions it performed for those upon whom the taxes fell. *Id.* at 150.

In *Ramah,* the Supreme Court found that a gross receipts tax imposed upon a construction company building a school on an Indian reservation was preempted by federal law. The Court stated that the case was indistinguishable in all relevant respects from *White Mountain. Ramah,* 458 U.S. at 839. The Court noted that the school in question was being built with extensive involvement by the Bureau of Indian Affairs (BIA). The BIA was contracted with for both the design and construction of the school, and any subcontracts had to be specifically approved by the BIA. *Id.* at 839. The BIA was required to conduct on-site inspections and prepare cost estimates for the project in cooperation with the tribal organization. *Id.* at 841.

The Secretary of the Interior had promulgated "detailed and comprehensive regulations" regulating the construction of the school. *Id.* at 840–41. Funding for the school was provided by a series of congressional appropriations specifically earmarked for that particular

school. *Id.* at 835. There was a federal policy of encouraging the development of Indian-controlled institutions on the reservation, as codified in the Indian Financing Act of 1974 (the IFA) and the Indian Self-Determination and Education Assistance Act (the ISDEAA). *Id.* at 840. The Court concluded that "Federal regulation of the construction and financing of Indian educational institutions is both comprehensive and pervasive." *Id.* at 839. The Court found that the detailed federal regulatory scheme governing construction of Indian schools was at least as comprehensive as the federal scheme found to be preemptive in *White Mountain. Id.* at 841.

The Court also noted that *Ramah* was not a case in which the state was seeking to assess its tax in return for the governmental functions the state provided to those who must bear the burden of paying the tax. *Id.* at 843. The state's justification for the gross receipts tax—that the tax was compensation to the state for granting "the privilege of engaging in business"—did not apply where the privilege of constructing a school on tribal lands was "exclusively bestowed by the Federal Government." *Id.* at 844. In addition, the tax directly fell upon the tribal organization because it reimbursed the contractor for the taxes paid. *Id.* at 835.

In the case at bar, the court of appeals properly distinguished *White Mountain* and *Ramah. Anderson,* 163 Wis. 2d at 1022. As will be discussed below, this is not a case governed by a pervasive federal regulatory scheme, as was the case in both *White Mountain* and *Ramah.* As opposed to the situation in *White Mountain,* where the BIA exercised daily supervision of logging operations, and that in *Ramah,* where the tribal organization contracted with the BIA and the BIA had supervisory powers over minute details of the project includ-

ing subcontracts, here neither the Secretary of the Interior nor the BIA has significant involvement in the operation of the schools at which Anderson was employed. Furthermore, in the case at bar, Wisconsin is seeking to assess its tax in return for the governmental functions the state provides to those who must bear the burden of paying the tax, which is in direct contrast to both *White Mountain* and *Ramah,* where there were no state justifications for the taxes.

The imposition of the tax in the case at bar does not obstruct federal policies and does not fall upon the tribe. Anderson himself is responsible for the payment of his income taxes. The tax will burden the tribe only if Anderson continues to reside off-reservation and only if he successfully passes the tax on to the tribe. Even if the economic burden of the tax were to fall upon the tribe, the tax would not necessarily have to be preempted. Although the Court found it significant in both *Ramah* and *White Mountain* that the economic burden of the asserted taxes ultimately fell upon the tribal organizations, the decision in *White Mountain* emphasized that there must be a comprehensive federal regulatory scheme before the state tax will be preempted:

> Of course, the fact that the economic burden of the tax falls on the Tribe does not by itself mean that the tax is pre-empted . . . . Our decision today is based on the pre-emptive effect of the comprehensive federal regulatory scheme, which . . . leaves no room for the additional burdens sought to be imposed by state law.

*White Mountain,* 448 U.S. at 151 n.15 (citations omitted).

Arguing that this is a case governed by a pervasive federal regulatory scheme, Anderson cites treaties between the Chippewa Nation and the United States entered into in 1837,[1] 1842,[2] and 1854;[3] the ISDEAA, 25 U.S.C. secs. 450-450n (1988); the Tribally Controlled Community College Assistance Act of 1978, 25 U.S.C. secs. 1801-1836 (1988) (the TCCCAA); and the IFA, 25 U.S.C. secs. 1451-1543 (1988), as evidence of the scheme.

With regard to the treaties cited by Anderson, they illustrate, for the purposes of this review, little more than the fact that in 1837, 1842, and 1854, the Chippewa Nation ceded lands to the United States, and, in exchange, the United States government established reservations and paid the Chippewa Nation sums of money, goods, tobacco, provisions, furniture, cattle, guns, ammunition, beaver traps, clothing, and cooking utensils. *See* 7 Stat. 536-37 (1837); 7 Stat. 591-92 (1842); and 10 Stat. 1109-11 (1854). The 1837 treaty mentioned education only when it stated that if the Indians should "conclude to appropriate a portion of that annuity to the establishment and support of a school or schools among them, this shall be granted them." 7 Stat. 537 (1837). The 1842 treaty mentioned education only by stating that a portion of the annual payment was to be used "for the support of schools for the Indians party to this treaty . . .." 7 Stat. 592 (1842). In like manner, the 1854 treaty mentioned education only by stating that a portion of the money paid was to be used "for moral and educational purposes, of which last sum, three hundred dollars per annum shall be paid to the Grand Portage band, to

---

[1] 7 Stat. 536 (1837).

[2] 7 Stat. 591 (1842).

[3] 10 Stat. 1109 (1854).

enable them to maintain a school at their village." 10 Stat. 1111 (1854).

We do not think that these treaties evidence a federal regulatory scheme of Indian education. Wisconsin's taxation of Anderson's income from his on-reservation educational employment does not conflict with the above treaties in any manner. However, we understand Anderson to be citing these treaties together with the federal statutes as evidence of his assertion of a pervasive federal regulatory scheme of Indian education. We will therefore consider the treaties in that context as we examine the federal statutes.

The federal statutes that Anderson cites, the ISDEAA, the TCCCAA, and the IFA, do evidence a comprehensive federal policy favoring Indian education. The ISDEAA states:

> The Congress declares that a major national goal of the United States is to provide the quantity and quality of educational services and opportunities which will permit Indian children to compete and excel in the life areas of their choice, and to achieve the measure of self-determination essential to their social and economic well-being.

25 U.S.C. sec. 450a(c). The TCCCAA states that its purpose is "to provide grants for the operation and improvement of tribally controlled community colleges to insure continued and expanded educational opportunities for Indian students, and to allow for the improvement and expansion of the physical resources of such institutions." 25 U.S.C. sec. 1802. Similarly, the IFA states:

> It is hereby declared to be the policy of Congress to provide capital on a reimbursable basis to help

269

develop and utilize Indian resources, both physical and human, to a point where the Indians will fully exercise responsibility for the utilization and management of their own resources and where they will enjoy a standard of living from their own productive efforts comparable to that enjoyed by non-Indians in neighboring communities.

25 U.S.C. sec. 1451.

These three statutes show that Congress has declared Indian education to be an important goal. These statutes, in combination with the above-cited treaties, illustrate that the United States has been concerned with Indian education since at least 1837. However, finding that Indian education has been declared by Congress to be an important goal does not equate to finding a pervasive federal regulatory scheme regarding the relationship between the tribe and Anderson such that the state's tax on Anderson's on-reservation income must be preempted. When we examine the three statutes more closely, we find that Wisconsin's tax on Anderson's income does not obstruct or interfere with the statutes.

One of the purposes of the ISDEAA was to delegate substantial control and responsibility over tribal education to Indian tribes. *Ramah,* 458 U.S. at 840. Prior to the enactment of the ISDEAA, the Bureau of Indian Affairs (BIA) exercised extensive control over Indian education. Congress found that this extensive control

has served to retard rather than enhance the progress of Indian people and their communities by depriving Indians of the full opportunity to develop leadership skills crucial to the realization of self-government, and has denied to the Indian people an effective voice in the planning and implementation of programs for

the benefit of Indians which are responsive to the true needs of Indian communities . . ..

25 U.S.C. sec. 450(a)(1). Consequently, the ISDEAA directed the Secretary of the Interior "upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs or portions thereof, including construction programs . . .." 25 U.S.C. sec. 450f(a)(1). The ISDEAA empowers the Secretary to promulgate regulations to accomplish the purposes of the ISDEAA. 25 U.S.C. sec. 450k. As discussed in *Ramah,* the Secretary has promulgated detailed and comprehensive regulations governing the construction of Indian schools. *Ramah,* 458 U.S. at 840–41. There are also regulations governing grants under the ISDEAA. *See* 25 C.F.R. secs. 272.1–272.55 (1991). However, there are not similar detailed and comprehensive regulations promulgated pursuant to the ISDEAA governing the compensation paid to individuals such as Anderson. To the contrary, the very purpose of the ISDEAA was to give Indians the right of self-determination, to leave the control of Indian education up to Indians themselves, and to refrain from extensive federal involvement.

The purpose of the TCCCAA is to "provide grants" for Indian community colleges. 25 U.S.C. sec. 1802. Grants made pursuant to the TCCCAA "shall go into the general operating funds of the institution to defray, at the determination of the tribally controlled community college, expenditures for academic, educational, and administrative purposes and for the operation and maintenance of the college." 25 U.S.C. sec. 1803(b). The BIA has promulgated comprehensive regulations pertaining to providing financial and technical assistance to Indian community colleges. *See* 25 CFR secs. 41.1–41.13 (1991).

The BIA has not, however, promulgated comprehensive regulations under the TCCCAA governing the compensation paid to individuals such as Anderson.

In like manner, the IFA, which is intended to provide financing for economic development on Indian reservations, does not entail detailed regulations governing the compensation paid to individuals such as Anderson.

Anderson has not cited any sections of the ISDEAA, the TCCCAA, the IFA, or regulations promulgated pursuant to those Acts which would lead us to conclude that Wisconsin's ability to tax Anderson's income is preempted. There is a lack of evidence of any significant regulatory scheme. Those regulations that come closest to even being relevant to this review are found in 25 CFR Parts 32 and 41.

The title of 25 CFR Part 32 is "Indian Education Policies." Its purpose is to "state the policies to be followed by all schools and education programs under the jurisdiction of the [BIA]." 25 CFR sec. 32.1 (1991). One of those policies is that Indians should be recruited for education positions on reservations. 25 CFR sec. 32.4(m) (1991). This is the only regulation that lends support to Anderson's argument of a federal regulatory scheme of Indian education. However, even construing any possible ambiguities in favor of Anderson, it does not establish a regulatory scheme governing the relationship between Anderson and the tribe.

The title of 25 CFR Part 41 is "Grants to Tribally Controlled Community Colleges and Navajo Community College," and it governs the provision of funds to tribal community colleges. Similar to 25 CFR Part 32, it also does not set up a regulatory scheme governing the relationship between Anderson and the tribe. These regula-

tions do not constitute a "detailed regulatory scheme" such as was found to preempt the state taxes in both *Ramah* and *White Mountain.*

The statutes and regulations cited by Anderson establish only that employment at Indian educational institutions is derivative from federal funds. There is no evidence of federal regulation of such employment beyond the provision of funds in a manner which suggests that Congress intended to preclude state taxation of those Indian educational institution employees who, such as Anderson, live off-reservation. The mere provision of federal funds is not a sufficient basis upon which to find pervasive and comprehensive regulation of Indian educational employment.

Applying *Ramah* and *White Mountain,* we find that the federal interests at stake in Indian education are not implicated in this case in a manner to require preemption of Wisconsin's tax on Anderson's income.

The tribal interests at stake here are also not implicated in such a manner as to require preemption. The tax does not fall upon the tribe. As stated above, the tax will only burden the tribe if Anderson continues to live off the reservation and only if he successfully passes the tax on to the tribe. On the record before us, this possible burden on the tribe is too speculative.

Having found that the tax on Anderson's income is not preempted by federal law, we now address Anderson's argument that the tax places an impermissible burden on the tribe and infringes on the tribe's sovereignty. For this argument, Anderson primarily relies upon *Ramah* and *White Mountain.* As illustrated above, those cases are not on point with the case at bar. Nonetheless, Anderson argues that the tax on his income places an

inevitable burden on the tribe and infringes on the tribe's right to make its own laws and be ruled by them.

John Quaderer, a member of the Tribal Governing Board, testified before the commission that the tribe has experienced serious economic problems. He further testified that if tribal educational employees are subject to state taxation and demand higher wages, the tribe would be forced to cut back current educational services. Anderson testified before the commission that if his wages were subject to state taxation, he would be forced to demand higher wages or seek employment elsewhere. Anderson argues that the tribe will not be able to meet the increased salary demands of its educational employees, and this will lead to a "brain drain." Anderson also argues that the result we reach today will compel him to quit, thus burdening the tribe.

We are not persuaded by Anderson's arguments. On the record before us, these arguments are too speculative to be given weight. Whatever incidental burden may be placed on the tribe by the state's tax on Anderson's income does not interfere with the tribe's right to make its own laws and be ruled by them. The department admits that the tribe has the right to tax Anderson's income, as it is earned on-reservation. Wisconsin's tax on Anderson's income does not interfere with this right. As stated by Justice Rehnquist, "If Indians are to function as quasi co-sovereigns with the States, they like the States, must adjust to the economic realities of that status as every other sovereign competing for tax revenues . . .." *Washington v. Confederated Tribes*, 447 U.S. 134, 186 (Rehnquist, J., concurring), *reh'g denied* 448 U.S. 911 (1980). We are not of the opinion that the tribe's right to tax Anderson's income, in the absence of the

exercise of that right, precludes the state's co-equal right to tax.

This case is different from *White Mountain* and *Ramah,* where in both cases the state did not have a valid justification to tax. All states have the right to tax their residents in return for the governmental functions the state provides to those residents. *Lawrence,* 286 U.S. at 279. Here, Anderson receives the protections and benefits of the state government, and he must help to bear the burden of that government as must all other residents of the state. The tax upon Anderson's income only exists because Anderson lives off-reservation. As the department conceded at oral argument, there would not be a tax on the income at issue here if Anderson lived on the reservation.

We find that the tax on Anderson's income does not place an impermissible burden on the tribe and does not interfere with the tribe's sovereignty. We therefore decline to deny the sovereignty of the state of Wisconsin to tax Anderson's income.

We now address Anderson's argument that the court of appeals opinion is contrary to *McClanahan.* In *McClanahan,* the Supreme Court held that a state may not "tax a reservation Indian for income earned exclusively on the reservation." *McClanahan,* 411 U.S. at 168. In the case at bar, the court of appeals interpreted the term "reservation Indian" to refer to an Indian living on the reservation. *Anderson,* 163 Wis. 2d at 1019. Anderson argues that this interpretation is incorrect, that "reservation Indian" refers to cultural orientation rather than geographic location, and that a "reservation Indian" is an Indian who has not been assimilated into the general community.

Anderson argues that he views himself as a reservation Indian due to his membership in the tribe, his dedi-

cation to tribal education, and the retention of his Indian cultural heritage. He testified before the commission that during the relevant period he considered the reservation to be his home, situated his professional career there, and lived within the service area of the reservation.

We are not persuaded by Anderson's argument. In *McClanahan,* the appellant was an enrolled member of the Navajo tribe and lived on the Navajo reservation. *McClanahan,* 411 U.S. at 165. We agree with the court of appeals that the term "reservation Indian" refers to an Indian living on the reservation. *McClanahan* did not address the issue we face today. We would, therefore, have to extend *McClanahan* in order for it to apply here. We decline to do so. *McClanahan* was decided by the Supreme Court on the same basis as *White Mountain* and *Ramah:* whether the tax in question was preempted by the relevant treaties, statutes, and the policies behind them. As stated above, we do not think that Wisconsin's tax on Anderson's income is preempted by the relevant treaties, statutes, and the policies behind them. We therefore find that the court of appeals opinion is not contrary to *McClanahan.*

By the Court.—The decision of the court of appeals is affirmed.

SHIRLEY S. ABRAHAMSON, J. *(dissenting).* I dissent because I believe that federal law preempts the State of Wisconsin from taxing the income John Anderson earned from educational activities on the Lac Courte Oreilles reservation. Anderson is an enrolled member of the tribe who lives off the reservation. He has served tribal education as a high school guidance counselor, public information officer for the elementary and high

schools, director of education for the tribe, and president of the Lac Courte Oreilles Community College.

As the majority states, when analyzing state taxation of income earned on a reservation, the United States Supreme Court has established a preemption analysis distinct from that applied in other areas of the law. In each case, the court must conduct a "particularized examination of the relevant state, federal, and tribal interests." *Cotton Petroleum Corp. v. New Mexico,* 109 S. Ct. 1698, 1707 (1989) (quoting *Ramah Navajo School Board v. Bureau of Revenue of New Mexico,* 458 U.S. 832, 838 (1982)). Determining whether federal law preempts state taxation "is primarily an exercise in examining congressional intent." *Cotton,* 109 S. Ct. at 1707. In examining the relevant federal statutes and treaties, the court must recognize the tradition of tribal sovereignty and the broad policy of promoting tribal independence and development. Moreover, preemption is not limited to situations in which Congress has expressly stated its intent to preempt state activity; the court may find implied Congressional preemption. Ambiguities in federal law are "resolved in favor of tribal independence." *Cotton,* 109 S. Ct. at 1707. In sum, "the relevant preemption test is a flexible one sensitive to the particular state, federal, and tribal interests involved." *Cotton,* 109 S. Ct. at 1711.

The Supreme Court's decisions applying this case-by-case preemption analysis provide uncertain guidance to state and federal courts. One commentator described Supreme Court Indian law decisions as "a chaotic lot" and critiqued the decisions concerning Congress's preemption of state taxation as follows:

> [The Court] requires a case-by-case consideration of whether the state tax is "preempted" by federal statutes and treaties, supposedly read generously to pre-

serve tribal immunity. Since no federal statute or treaty expressly preempts the state law, these cases necessarily become unguided judicial excursions identifying and weighing the state interests in taxation and the federal policy on a particular matter . . . for a particular reservation. The Court seems to have ignored the value of manageable judicial standards . . .[1]

Justice Rehnquist wrote that the extent to which states can tax economic activity on Indian reservations within their borders "seems destined to demand its attention over and over again until the Court sees fit to articulate, and follow, a consistent and predictable rule of law." *Ramah Navajo School Board v. Bureau of Revenue of New Mexico,* 458 U.S. 832, 847 (1982) (Rehnquist, J., dissenting).

Examining the statements of Congressional intent relevant to this case, I conclude that Congress has implicitly preempted state taxation of the income Anderson earned from educational activities on the reservation. Congress has clearly and affirmatively expressed the relevant policy: As a primary goal of federal policy, Congress seeks to promote and improve tribal education and to accomplish this goal through tribal self-determination of educational policies.[2] The Bureau

---

[1] Philip P. Frickey, *Congressional Intent, Practical Reasoning, and the Dynamic Nature of Federal Indian Law,* 78 Cal. L. Rev. 1137, 1187, 1189 (1990). See also Charley Carpenter, Note, *Preempting Indian Preemption: Cotton Petroleum Corp. v. New Mexico,* 39 Cath. U. L. Rev. 639 (1990); Kristina Bogardus, Note, *Court Picks New Test in Cotton Petroleum,* 30 Nat. Resources J. 919 (1990).

[2] *See, e.g.,* 25 U.S.C. sec. 450a(c), in which Congress declared that "a major national goal of the United States is to provide the quantity and quality of educational services and opportunities which will permit Indian children to compete and excel in the life

of Indian Affairs (BIA) has promulgated regulations appropriate to this policy. In all, federal policy consistently implements Congressional intent by reserving great control and discretion to individual tribes in the determination of educational policies while ensuring technical and financial support from the federal government as necessary. I believe this federal scheme, when examined in accordance with the Supreme Court's preemption analysis favoring tribal independence, preempts the state taxation at issue in this case.

Congress's clearest statement of its policy is the Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. secs. 450 *et seq.* Before passage of the act, the federal government completely controlled most facets of Indian education. In passing the Self-Determination Act, Congress stated its desire to promote "an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services." 25 U.S.C. sec. 450a(b). To implement this policy, Congress expressed its intention to refrain from the comprehensive regulation of education:

> The Congress hereby recognizes the obligation of the United States to respond to the strong expression of the Indian people for self-determination by assuring maximum Indian participation in the direction of educational . . . services to Indian communities so as to render such services more responsive to the needs and desires of those communities. 25 U.S.C. sec. 450a(a).

---

areas of their choice, and to achieve the measure of self-determination essential to their social and economic well-being."

279

Furthermore, Congress found that "parental and community control of the educational process is of crucial importance to the Indian people." 25 U.S.C. sec. 450(b)(3).

The BIA promulgated regulations to enact these policies. Consistent with a goal of achieving tribal self-determination in education, the regulations concerning educational policy are not extensive. The BIA's goals include ensuring that tribes "fully exercise self-determination and control in planning, priority-setting, development, management, operation, staffing and evaluation in all aspects of the education process;" encouraging and defending the tribes' right "to govern their own internal affairs in all matters relating to education;" and ensuring that "qualified . . . Indian educators are recruited for positions appropriate to their cultural background and qualifications." 25 C.F.R. secs. 32.4(a)(3), (g)(2), and (m) (1991).

Congress's laws and the BIA's regulations are limited to those necessary to help the tribes achieve control over education, including the provision of technical and financial support. In fact, for all practical purposes, the Lac Courte Oreilles schools are supported exclusively by federal funds. Findings of Fact, *Anderson v. DOR,* No. I-11838 (Tax App. Comm'n, Mar. 3, 1987). In addition, the Tribally Controlled Community College Assistance Act, enacted in 1976, 25 U.S.C. secs. 1801, *et seq.,* helped create the Lac Courte Oreilles Community College, of which Anderson served as president. The BIA accordingly promulgated regulations "to support and encourage the establishment, operation, and improvement" of these community colleges, 40 C.F.R. sec. 41.1 (1991), not to regulate their functions extensively.

Anderson and others in similar positions advance the goals of this federal scheme. Anderson advances

these goals through his position regardless of where he lives. Neither the DOR nor the majority cites any federal policy that encourages tribal educators to live on the reservation. Taxation of the income Anderson earned from educational activities burdens the achievement of these federal goals by tapping federally provided funds used to promote tribal education.[3]

In concluding that federal law does not preempt state taxation in this case, the majority understates the relevant federal and tribal concerns and overstates the relevant state interests. The majority essentially relies on two considerations to support its conclusion that the state tax is not preempted: (1) the absence of a "pervasive federal regulatory scheme" governing tribal education and (2) the absence of detailed federal regulations specifically governing compensation paid to individuals in Anderson's position. While these considerations are certainly relevant to the preemption analysis, they in no way preclude the conclusion that federal law preempts state taxation in this case.

First, I agree with the majority's reading of *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980), and *Ramah Navajo School Board v. Bureau of Revenue of New Mexico*, 458 U.S. 832 (1982). In these cases the Supreme Court based its holding of federal preemption at least in part on "comprehensive" BIA regulations governing logging and the construction of educational facilities, the on-the-reservation activities taxed by the state. These regulations left "no room" for additional state

---

[3]One need only look to elementary economic principles to understand that the tribe will almost certainly bear all or some of the burden from the imposition of the state income tax. Wages paid to educators on the reservation will be equivalent to higher wages paid to educators off the reservation only if the reservation wage is exempt from state income tax.

burdens. *White Mountain,* 448 U.S. at 145–48; *Ramah,* 458 U.S. at 839–42. Despite the Supreme Court's reliance on the pervasive federal regulatory schemes in *White Mountain* and *Ramah,* the Supreme Court used those pervasive schemes only as evidence of preemption; the Court in no way indicated that a pervasive federal regulatory scheme is necessary to hold that federal law preempts a state tax.

The *Ramah* case is particularly instructive for purposes of the issue before us. In *Ramah,* the Supreme Court ruled that federal law preempted the imposition of New Mexico's gross receipts tax on a non-Indian company constructing school facilities on a reservation. The Court cited comprehensive federal regulations governing the construction and financing of Indian school facilities. The Court wrote that the burden of the state tax, "although nominally falling on the non-Indian contractor, necessarily impedes the clearly expressed federal interest in promoting the 'quality and quantity' of educational opportunities for Indians by depleting the funds available for the construction of Indian schools." *Ramah,* 458 U.S. at 842.

Despite the absence in this case of "comprehensive regulations" governing the development and implementation of tribal educational policy, the same "clearly expressed federal interest" preempts the imposition of the state income tax and the resulting depletion of funds available for education. The quantity of regulation is not the appropriate measure of federal preemption. Rather, in this case, the absence of regulation reflects a clearly expressed federal policy.

Second, the Supreme Court's Indian law decisions do not require preemption of the specific activity taxed to support federal preemption. In *Ramah,* the majority opinion noted that the court must examine the totality

of the federal scheme and not the specific target of the tax. *Ramah,* 458 U.S. at 841–42 n.5. The totality of the federal scheme governing tribal education preempts the tax in this case.

Finally, the majority describes as a "vital state interest" the assessment of income taxes in return for the governmental functions the state provides taxpayers living outside the reservation. The services the state provides to Anderson are similar to those New Mexico provided to the non-Indian taxpayers in *Ramah.* Although the *Ramah* decision does not discuss the off-reservation activities of the construction company, one must assume that planning and management activities, support staff functions, and the acquisition and storage of equipment for the construction project all occurred off the reservation in locations serviced by state government. In *Ramah,* the Supreme Court rejected New Mexico's attempt to justify its tax as compensation for state services benefiting these off-reservation activities: "The only arguably specific interest advanced by the State is that it provides services to [the school construction company] for its activities *off the reservation.* This interest, however, is not a legitimate justification for a tax whose ultimate burden falls on the tribal organization." *Ramah,* 458 U.S. at 843–44. Similarly, the state provides services that directly benefit Anderson, but the state's interest does not justify a tax which necessarily impedes the clearly expressed federal interest in promoting educational opportunities for the tribe by depleting the funds available for education.

Accordingly, I dissent.

I am authorized to state that CHIEF JUSTICE NATHAN S. HEFFERNAN joins this dissent.