Joan LaRock, Petitioner-Appellant,†

v.

Wisconsin Department of Revenue, Defendant-Respondent.

Court of Appeals

*No. 99–0951. Submitted on briefs October 25, 1999.—Decided December 28, 1999.*

## 2000 WI App 24

(Also reported in 606 N.W.2d 580.)

†Petition to review granted.

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Gerald L. Hill* and *Jennifer L. Nutt Carleton* of *Oneida Law Office*, Oneida.

On behalf of the defendant-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney

general, and *F. Thomas Creeron III*, assistant attorney general, Madison.

Before Cane, C.J., Hoover, P.J., and Peterson, J.

¶ 1. HOOVER, P.J. This appeal concerns whether Joan LaRock, a Menominee Indian living on and deriving income from sources on the Oneida Indian reservation, is exempt from Wisconsin's income tax. LaRock appeals a circuit court judgment affirming the Wisconsin Tax Appeals Commission's decision. The commission held that Wisconsin may impose an income tax on LaRock because, although an Indian, she is not a member of the Oneida tribe on whose land she resides and from whom she derives income. LaRock contends that she is exempt from Wisconsin's income tax based on her status as an Indian living in and deriving income from sources in Indian country. She claims that Wisconsin's exercise of tax jurisdiction is preempted by: (1) treaties and federal statutes; (2) *McClanahan*'s prohibition against taxing reservation Indians residing on and deriving income from the reservation, *McClanahan v. Arizona*, 411 U.S. 164, 165 (1973); and (3) the federal and tribal interests implicated. We conclude that the treaties and federal statutes do not preempt the exercise of state tax jurisdiction. We hold that *McClanahan* exempts only Indians who reside on and derive income from their own tribe's land. Finally, we determine that federal and tribal interests are not implicated in such a manner as to require preemption. Accordingly, we affirm the circuit court judgment.

¶ 2. The facts are not in dispute.[1] LaRock resides in Wisconsin, on land that is part of the Oneida reser-

---

[1] The parties stipulated to most of the relevant facts. There were several facts found by the commission that were not stipu-

vation. She is employed by the Oneida tribe. Although not a part of the commission's findings and not contained in the appellate record, it is undisputed that her employment is on the Oneida reservation. LaRock is a member of the Menominee Indian tribe of Wisconsin. She married an Oneida Indian, with whom she had four children, two of whom still reside with her. She is divorced from her Oneida husband. Her children are enrolled members of the Oneida tribe; she is not.

¶ 3. In 1994, LaRock filed a Wisconsin tax return. She claimed a deduction of $18,774 based on her Native American status, resulting in a refund. The Wisconsin Department of Revenue disallowed the deduction on the basis that she was not living and working on her own tribe's reservation. LaRock appealed to the Wisconsin Tax Appeals Commission, which affirmed the department's disallowance of the deduction. LaRock appealed to the Brown County Circuit Court, which affirmed the commission.

## Standard of Review

¶ 4. On appeal, we review the commission's rather than the circuit court's decision. *See Stafford Trucking v. DILHR*, 102 Wis. 2d 256, 260, 306 N.W.2d 79, 82 (Ct. App. 1981). The application of law to undis-

---

lated to and are not contained in the appellate record. Neither party included the Department of Revenue's file in the appellate record. Because the record is incomplete, we assume the missing material supports the commission's findings. *See Fiumefreddo v. McLean*, 174 Wis. 2d 10, 26–27, 496 N.W.2d 226, 232 (Ct. App. 1993) (the appellant is responsible for ensuring that the record is complete on appeal, and when the record is incomplete we must assume that the missing material supports the court's ruling).

puted facts is a question of law; we are not bound by the commission's conclusions. *Anderson v. DOR*, 169 Wis. 2d 255, 262, 484 N.W.2d 914, 916 (1992). We will, however, defer to the commission's determinations of law under certain circumstances, depending on the level of expertise the agency has acquired in the area. *See Barron Elec. Coop. v. PSC*, 212 Wis. 2d 752, 760–64, 569 N.W.2d 726, 731–32 (Ct. App. 1997). Our supreme court has identified three distinct levels of deference granted to agency decisions: great weight deference, due weight deference and de novo review. *See UFE, Inc. v. LIRC*, 201 Wis. 2d 274, 284, 548 N.W.2d 57, 61 (1996). Which level is appropriate "depends on the comparative institutional capabilities and qualifications of the court and the administrative agency." *Id.* (quoted source omitted).

¶ 5. The department suggests that "some recognition of the Commission's prior experience in this area is appropriate upon judicial review," but does not define what level of deference should be accorded its decision and argues the case as though the standard is de novo. LaRock contends no weight should be given the commission's legal determinations. Because both parties' arguments are based upon a de novo review of the commission's legal determinations, we proceed on that basis.

## Analysis

¶ 6. We begin with some general observations regarding Wisconsin's tax jurisdiction and the special and unique place in American law held by Indian tribes and their members. Wisconsin may levy an income tax on all citizens domiciled within the state because "domicile in itself establishes a basis for taxation." *Lawrence*

*v. State Tax Comm'n*, 286 U.S. 276, 279 (1932). The state has a vital interest "in ensuring that all residents of the state bear their responsibility for sharing the costs of government." *Anderson*, 169 Wis. 2d at 263, 484 N.W.2d at 916. "Enjoyment of the privileges of residence within the state, and the attendant right to invoke the protection of its laws, are inseparable from the responsibility for sharing the costs of government." *Id.* at 262, 484 N.W.2d at 916 (quoting *Lawrence*, 286 U.S. at 279). The general rule is that a "jurisdiction . . . may tax *all* the income of its residents, even income earned outside the taxing jurisdiction." *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 462–63 (1995). Pursuant to this authority to tax, Wisconsin imposes a personal income tax upon "every natural person residing within the state . . . ." Section 71.02(1), STATS., 1993–94. All income of residents follows the individual's residence. *See* § 71.04(1), STATS., 1993–94. Indians living on a reservation are also residents of the state where the reservation is located. *See Meyers v. Board of Educ.*, 905 F. Supp. 1544, 1576 (C.D. Utah 1995).

¶ 7. Applying Wisconsin's income tax to an Indian concerns matters beyond state law. It implicates federal and tribal law. "The Constitution vests the Federal Government with exclusive authority over relations with Indian tribes. . . . [A]nd in recognition of the sovereignty retained by Indian tribes even after formation of the United States, Indian tribes and individuals generally are exempt from state taxation within their own territory." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 764 (1985) (citations omitted). Although the federal courts have balanced federal, state and tribal interests in diverse contexts, when a state attempts to levy a tax directly on an Indian tribe

or its members residing in and deriving income from sources within Indian country, the courts have employed "a more categorical approach: '[A]bsent cession of jurisdiction or other federal statutes permitting it' . . . a State is without power to tax reservation lands and reservation Indians."[2] *Chickasaw Nation*, 515 U.S. at 458 (quoting *County of Yakima v. Confederated Tribes & Bands of Yakima Nation*, 502 U.S. 251, 258 (1992)). Against this backdrop, LaRock contends that Wisconsin is preempted from taxing her income.

## Treaties and Federal Statutes

¶ 8. We begin with LaRock's claim that treaties and federal statutes preempt the state's jurisdiction to tax her income. She contends that "[n]one of the applicable treaties or federal legislation confer authority to the State of Wisconsin to tax Indians on the Oneida Reservation," and the State's ability to tax her income is therefore preempted.

■

¶ 9. Our examination of the treaties and federal laws she relies on discloses that they neither expressly preempt nor authorize Wisconsin to impose an income

---

[2] The case usually cited for this "categorical approach" is *McClanahan v. Arizona*, 411 U.S. 164, 165 (1973). It is not clear whether this approach operates as an absolute bar absent federal authorization or as a rebuttable presumption against finding state tax jurisdiction. In *Oklahoma Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 126 (1993), the Court spoke of "the *McClanahan* presumption [that] counsels against finding [state tax] jurisdiction," but in *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 458 (1995), the Court characterized *McClanahan* as a prohibition. For purposes of our analysis, we will treat the Supreme Court's categorical approach as an absolute bar to finding state tax jurisdiction.

tax on LaRock. The treaties in question merely pronounce the sovereignty of the Menominee and Oneida tribes. LaRock cites us to the Buck Act and Public Law 280 as statutes supporting her preemption argument. Neither statute expressly authorizes or prohibits the exercise of state tax jurisdiction.[3] We therefore cannot conclude that the treaties or federal statutes preempt state tax jurisdiction here.

¶ 10. The Buck Act provides that states may impose an income tax upon residents of federal areas, *see* 4 U.S.C. § 105–109, but provides in § 109 that "[n]othing in sections 105 or 106 of this title shall be deemed to authorize the levy or collection of any tax on or from any Indian not otherwise taxed." The Buck Act "cannot be read as an affirmative grant of tax-exempt status to reservation Indians . . . ." *McClanahan*, 411 U.S. at 177.

¶ 11. Public Law 280 granted Wisconsin and several other states jurisdiction over civil claims for relief between Indians or to which Indians are parties. *See* 28 U.S.C. § 1360. It is insufficient alone to confer tax authority over Indians and Indian reservations, *see Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 513 (1991), and "cannot be read as expressly conferring tax immunity upon Indians." *McClanahan*, 411 U.S. at 178.

## *McClanahan*

¶ 12. We now address the application of *McClanahan*. In *McClanahan*, the United States Supreme

---

[3] The State does not contend that its tax authority derives from either the treaties or any specific federal legislation, but rather from the inherent power of a sovereign to tax its residents.

Court held that a state could not subject "reservation Indians" whose income derived from the reservation to a state income tax absent express authorization from Congress. *Id.* at 165. *McClanahan* involved an enrolled member of the Navajo tribe who lived and worked on the Navajo reservation in Arizona. *See id.* at 165–66. All of her income was derived from sources on the reservation. *See id.* The Court held that by imposing an income tax on McClanahan, the state "interfered with matters which the relevant treaty and statutes leave to the exclusive province of the Federal Government and the Indians themselves."[4] *Id.* at 165. The tax was therefore "unlawful as applied to reservation Indians with income derived wholly from reservation sources." *Id.*

¶ 13. The *McClanahan* Court repeatedly used the term "reservation Indian," but never defined the term. In *Anderson,* the Wisconsin Supreme Court determined that the term refers to an Indian living on the reservation and that *McClanahan* is limited to when a tribal member both lives and earns a living on "the reservation." *See Anderson,* 169 Wis. 2d at 275–76, 484 N.W.2d at 922.[5] *McClanahan's* facts, however,

_____

[4] LaRock does not rely on the same treaties or federal legislation that were considered in *McClanahan.* The Arizona State Constitution and the Arizona Enabling Act (admitting Arizona into the union) provided limitations on the exercise of state jurisdiction over Indian lands. *See McClanahan,* 411 U.S. at 175–76. LaRock makes no claims based on the Wisconsin Constitution or the Wisconsin Enabling Act.

[5] The Supreme Court confirmed, in *Chickasaw Nation,* 515 U.S. at 453, that a state may tax the wages of members of the nation who reside in the state outside Indian country, although the members derive their income from sources on the nation's lands.

suggest an even narrower reading: that a "reservation Indian" is an Indian living on the reservation of the tribe in which he or she has membership. As indicated, McClanahan was enrolled in the Navajo tribe, lived on the Navajo reservation and derived her income from sources on the Navajo reservation. *Id.* at 165–66. We find support for this narrow reading of *McClanahan* in other Supreme Court decisions.

¶ 14. In *Oklahoma Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 125–26 (1993), the Supreme Court held that the prohibition against taxing applies to all of an Indian nation's lands, including restricted lands or lands held in trust, not just reservations. The Court summarized *McClanahan's* holding as the "State was without jurisdiction to subject [to taxation] a tribal member living on the reservation, and whose income derived from reservation sources . . . ." *Id.* at 123. It also noted:

> Our decision in *McClanahan* relied heavily on the doctrine of tribal sovereignty. We found a deeply rooted policy in our Nation's history of leaving Indians free from state jurisdiction and control. Indian nations, we noted, long have been distinct political communities, having territorial boundaries, within which their authority is exclusive. The Indian sovereignty doctrine, which historically gave state law no role to play within a tribe's territorial boundaries, did not provide a definitive resolution of the issues, but it did provid[e] a backdrop against which the applicable treaties and federal statutes must be read[.] Although exemptions from tax laws should, as a general rule, be clearly expressed, the tradition of Indian sovereignty requires that the rule be reversed when a State attempts to assert tax jurisdiction over an Indian tribe or tribal members living and working on *land set aside for those members*.

> To determine whether a tribal member is exempt from state income taxes under *McClanahan*, a court first must determine the residence of that tribal member.

*Id.* at 123–24 (internal quotation marks and citations omitted; emphasis added).[6]

¶ 15. Although the Supreme Court has not yet addressed the question of a state's imposition of an income tax on Indians residing on a reservation of a tribe in which they are not enrolled, it has addressed that issue in connection with a sales tax. In *Washington v. Confederated Tribes of Colville*, 447 U.S. 134, 160–61 (1980), the Court decided that the imposition of a cigarette sales tax upon Indian nonmembers of the tribe was permissible:

> The State asserts the power to apply its sales and cigarette taxes to Indians resident on the reservation but not enrolled in the governing Tribe. . . .
> Federal statutes, even given the broadest reading to which they are reasonably susceptible, cannot be said to pre-empt Washington's power to impose its taxes on Indians not members of the Tribe. . . . Similarly, the mere fact that nonmembers

---

[6] Although the *Sac & Fox* Court spoke of the relevant inquiry being whether an Indian lives and works in Indian country, that language was in response to the contentions in the case. Oklahoma claimed that because the tribe had been disestablished and there was no reservation, it could tax all the tribe's members because they did not live on a reservation. *Id.* at 124–26. The court noted that *McClanahan* is not limited to an actual reservation, but encompasses Indian country (which includes land held in trust or restricted lands). *Sac & Fox*, 508 U.S. at 125. The *Sac & Fox* Court did not address the specific issue before us: whether *McClanahan* applies to a nonmember Indian residing on and deriving income from another tribe's land.

resident on the reservation come within the definition of "Indian" for purposes of the Indian Reorganization Act of 1934, 48 Stat. 988, 25 U.S.C. § 479, does not demonstrate a congressional intent to exempt such Indians from state taxation.

Nor would the imposition of Washington's tax on these purchasers contravene the principle of tribal self-government, for the simple reason that nonmembers are not constituents of the governing Tribe. *For most practical purposes those Indians stand on the same footing as non-Indians resident on the reservation.*

*Id.* at 160–61 (emphasis added; citations omitted). Justice Rehnquist, concurring, opined:

As *McClanahan* explained, the doctrine of sovereign immunity traditionally recognized by this court derived from the sovereign relationship between a tribe and its members, and a recognition that state jurisdiction should not be asserted in a manner which frustrates tribal self-government. Immunities which have formed the backdrop for this Court's pre-emption analysis have been those derived from these precepts. This form of immunity, and the principles which underlie it, are simply inapplicable to the recognition of a tax immunity for an individual who resides on a reservation, but is not a member of the tribe. . . . The fact that the nonmember resident happens to be an Indian by race provides no basis for distinction. The traditional immunity is not based on race, but accouterments of self-government in which a nonmember does not share.

. . . These Indians residing on the reservation are citizens of the State, just the same as their non-Indian neighbors, and I am unwilling to conclude that their Indian status entitles them to an implied

> immunity from taxes which their non-Indian neighbors are required to pay.

*Id.* at 186–87 (Rehnquist, J. concurring) (internal quotations marks and citations omitted).

¶ 16. *Duro v. Reina*, 495 U.S. 676 (1990), adopted *Colville's* analysis in a different context. In *Duro*, the Court ruled that an Indian tribe may not assert criminal jurisdiction over nonmember Indians. The *Duro* Court also stated:

> Exemption from state taxation for residents of a reservation ... is determined by tribal membership, not by reference to Indians as a general class. We have held that States may not impose certain taxes on transactions of tribal members on the reservation because this would interfere with internal governance and self-determination. *But this rationale does not apply to taxation of nonmembers, even where they are Indians*[.]

*Id.* at 686–87 (emphasis added; citations omitted). *Duro's* specific holding regarding criminal jurisdiction was legislatively overruled.[7] Nevertheless, the distinction between tribal members and nonmembers it articulated is still valid. The Supreme Court has not distanced itself from the statements it made in *Duro,* nor has it overruled or limited *Colville*. Those two cases enunciated the principle that critical to the resolution of a taxation issue involving an Indian is whether the Indian affected by the exercise of a sovereign's taxing power is a member of the tribe or nation upon whose lands he or she resides and derives income.

¶ 17. Following the *Colville* decision, no state or federal tribunal has interpreted *McClanahan* to mean

---

[7] *See* 25 U.S.C. § 1301(2); *see also Strate v. A–1 Contractors*, 520 U.S. 438, 446 n.5 (1997).

that a state cannot tax the income of an Indian who is living and working on another tribe's land. *See, e.g., New Mexico Tax. & Rev. Dept. v. Greaves*, 864 P.2d 324 (N.M. App. 1993); *State ex rel. Arizona DOR v. Dillon*, 826 P.2d 1186 (Ariz. App. 1992). Although these cases are not controlling, they tend to support a narrow interpretation of *McClanahan*.

¶ 18. We conclude that *McClanahan's* prohibition of state income tax authority applies only when the Indian both resides and derives income from his or her own tribe's lands.

¶ 19. LaRock seems to assert that the Oneida Reservation is also part of Menominee tribal lands. She directs us to a treaty between the Menominee and Oneida entered into on September 23, 1822. In that treaty, the Menominee did "hereby cede, release, and quit claim to them, the people of said . . . Oneida . . . nation[ ], forever, all the right, title, interest, and claim of them, the Menominie nation of Indians, to all the lands . . . described . . . ." Treaty of September 23, 1822, between Oneida, Stockbridge, Tuscarora, St. Regis, Munsee and Menominee Tribes of Indians. The treaty also provided that the "Menominies[ ] shall have the free permission and privilege of occupying and residing upon the lands herein ceded in common with [the Oneida]." LaRock claims that the treaty not only gave the Menominee the right to reside on the Oneida reservation, but also created a sisterhood between the Menominee and Oneida tribes. We disagree for several reasons.

¶ 20. First, the treaty was superseded by later treaties. The February 8, 1831, treaty between the United States and the Menominee stated:

[A]nd although always protesting that they are under no obligation to recognize any claim of the New York Indians [this includes the Oneida] to any portion of their country; that they neither sold nor received any value, for the land claimed by these tribes; yet . . . they agree that such part of the land described, being within the following boundaries, as he [the President] may direct, may be set apart as a home to the several tribes of the New York Indians . . . . The country hereby ceded to the United States, for the benefit of the New York Indians . . . .

Treaty between Menominee Tribe of Indians of Wisconsin and United States of America, February 8, 1831. CHARLES J. KAPPLER, INDIAN TREATIES 1778–1883, 319–23 (1975). The February 17, 1831, treaty between the United States and Menominee further confirmed that the land referenced in the February 8 treaty "was ceded to the United States . . . ." Treaty between Menominee Tribe of Indians of Wisconsin and United States of America, February 17, 1831. KAPPLER, *supra* at 323.

¶ 21. A February 3, 1838, treaty between the Oneida and the United States provided:

ART. 1. The First Christian and Orchard parties of Indians cede to the United States all their title and interest in the land set apart for them in the 1st article of the treaty with the Menomonies of February 8th, 1831, and the 2nd article of the treaty with the same tribe of October 27th, 1832.

ART. 2 From the foregoing cession there shall be reserved to the said Indians to be held as other Indian lands are held a tract of land containing one hundred (100) acres, for each individual, and the lines of which shall be so run as to include all their

settlements and improvements in the vicinity of Green Bay.

Treaty between Oneida Tribe of Indians of Wisconsin and the United States of America, February 3, 1838. KAPPLER, *supra* at 517.

¶ 22. The federal government did not set aside, restrict or hold in trust the Oneida reservation as land for the Menominee tribe; it obtained the land for the Oneida reservation from the Menominee. The Menominee ceded that land to the United States in earlier treaties. The federal government also determined the size of the Oneida reservation based upon the number of Oneida present, not the number of Menominee and Oneida.

██

¶ 23. Further, the 1822 treaty's language, including that cited by LaRock, cannot reasonably be construed to give Menominee tribal members a dual membership in another tribe. The treaty does not create special status for enrolled Menominees resulting in a tax exemption for them when they live and work on the Oneida reservation. Because LaRock does not reside and derive income on her own tribe's land, we conclude that *McClanahan's* prohibition against state tax jurisdiction does not apply.

██

¶ 24. LaRock also claims that the commission's interpretation of *McClanahan* discriminates against her on the basis of her ancestry and native origin, by refusing to recognize her as an Indian living in Indian country. Wisconsin, however, does *not* exempt any Indian income from taxation. Its tax policy is nondiscriminatory; it is the same with respect to all racial and ethnic groups living within reservation boundaries. Any distinctions as to taxability arise solely as the

result of the preemptive effect of federal law. *See Anderson*, 169 Wis. 2d at 262–63, 484 N.W.2d at 916.

*State versus Federal and Tribal Interests*

█

¶ 25. LaRock next claims that certain federal and tribal interests warrant preemption.[8] She asserts that the federal interest in creating jobs for Indians on Indian reservations preempts Wisconsin's tax jurisdiction. She directs our attention to provisions encouraging the employment of Indians by Indian tribes or by industries located on or near reservations.[9] To preempt a state tax, "there must be a comprehensive federal regulatory scheme." *Id.* at 267, 484 N.W.2d at 918. LaRock points to no regulatory scheme much less a comprehensive scheme that "leaves no room for the additional burdens sought to be imposed by state law." *Id.* (quoting *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 151 n.15 (1980)).

¶ 26. LaRock next contends that the Oneida tribe's interests compel preemption. She claims that she receives significant services from the tribe and therefore the tribe has a strong interest in preventing Wisconsin from exercising its tax authority. That the

---

[8] There is language in *Sac & Fox*, 508 U.S. at 126, suggesting that if *McClanahan* does not apply, there is no need to examine the federal and tribal interests implicated. The Supreme Court, however, has not directly so held. We therefore proceed with an analysis of whether the Oneida and federal interests at issue preempt Wisconsin's exercise of tax jurisdiction, recognizing that these interests are significantly weakened because LaRock does not reside on her own tribe's reservation

[9] Specifically, LaRock directs us to 42 U.S.C. §§ 2000e(b) and 2000e–2(j) and 26 U.S.C. §§ 168(j) and 45(A).

tribe grants benefits to LaRock does not, ipso facto, demonstrate that the tribe's self-governance and controlling internal relations interests are implicated by Wisconsin's exercise of tax jurisdiction, nor does she develop this argument. She does not contend that the services are provided to her because she is an Indian rather than because members of her household are enrolled Oneida tribal members.[10] In addition, she has presented no evidence from the Oneida tribe indicating its interest. Although she claims that the tribe has a strong interest in the revenues generated as a result of her employment, she does not define what that interest is other than to say it exists.

¶ 27. We also conclude that the exercise of state tax jurisdiction here does not implicate the Oneida tribe's power to protect tribal self-government for the simple reason that nonmembers are not constituents of the governing tribe. LaRock admits that she cannot vote in tribal elections or attend General Tribal Council meetings. Indeed, her argument would frustrate tribal self-government because it treats Indians as though they are one homogenous group without recognizing tribal differences. LaRock's argument is at odds with accepted notions of tribal sovereignty. Indian tribes "long have been distinct political communities," *Sac & Fox Nation*, 508 U.S. at 123 (internal quotation marks omitted), that "retain their inherent power to

---

[10] LaRock recites a number of benefits her family receives from the tribe. The appellate record, however, does not reflect that she receives benefits from the Oneida tribe, much less identify what they are. We therefore do not consider them. *See Nelson v. Schreiner*, 161 Wis. 2d 798, 804, 469 N.W.2d 214, 217 (Ct. App. 1991) ("Assertions of fact that are not part of the record will not be considered.").

punish tribal offenders, to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members." *Strate v. A–1 Contractors*, 520 U.S. 438, 459 (1997) (internal quotation marks and brackets deleted). The "tribe's inherent power does not reach beyond what is necessary to protect tribal self-government or to control internal relations." *Id.* (quotation marks and brackets deleted).

¶ 28. In conclusion, no act of Congress, treaty, state statute or agreement with any tribe impairs Wisconsin's right to impose an income tax on enrolled members of a federally recognized Indian tribe that live and work on a reservation of another tribe. Consequently, the judgment is affirmed.

*By the Court.*—Judgment affirmed.